**S. Lorraine BRANDON, Plaintiff,**

v.

**COOK PAINT & VARNISH COMPANY, Defendant.**

**No. 82–0591–CV–W–1.**

United States District Court, W.D. Missouri, W.D.

April 27, 1983.

Joseph Y. DeCuyper, Snowden & DeCuyper, Kansas City, Mo., for plaintiff.

Linda J. French, John R. Phillips, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., for defendant.

## MEMORANDUM OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

JOHN W. OLIVER, Senior District Judge.

### I.

This Title VII case was tried April 4 and 5, 1983. On April 1, 1983, in accordance with the usual pretrial orders of this Court, each of the parties filed their respective proposed findings of fact and proposed conclusions of law. Counsel were afforded an opportunity to file amended proposed findings and proposed conclusions after trial. On April 6, 1983, plaintiff filed her amended proposed findings of fact. On the same day, defendant submitted a copy of its April 1, 1983 proposed findings of fact, appropriately marked in a manner which reflected the fact that defendant wished to withdraw a substantial number of the findings which defendant originally proposed in its April 1, 1983 filing.

Counsels' exemplary compliance with other pretrial directions made in regard to the execution of a stipulation of facts and those made in connection with findings of fact proposed by opposing counsel substantially increased the area of the undisputed factual circumstances of this case. In accordance with the Court's direction, counsel for plaintiff marked a copy of the findings proposed by defendant in a manner which clearly indicated which paragraphs of defendant's proposed findings were admitted, in whole or in part. Counsel for defendant, in a similar manner, marked a copy of the amended findings proposed by plaintiff.

The Court is thus able to state in the next part of this memorandum opinion a substantial number of undisputed findings of fact which the parties either stipulated to be true or which the parties have expressly admitted to be true under the procedure above outlined.

### II.

#### A.

The parties stipulated that the following facts were admitted and required no proof in the stipulation filed April 1, 1983:

1. Plaintiff is a female, adult citizen of the United States and was a resident of the State of Missouri at the time of the alleged discriminatory acts and at the time her complaint was filed.

2. The Company is a corporation doing business within the Western District of Missouri at 919 East 14th Avenue, North Kansas City, Missouri 64116, and is an employer within the meaning of 42 U.S.C. § 2000e, et seq.

3. Plaintiff was employed by Federal Mogul Corporation from September 22, 1966 to January 31, 1974.

4. Plaintiff was a Secretary and General Clerk I while employed at Federal Mogul Corporation.

5. During her employment with Federal Mogul Corporation, plaintiff performed various duties, including the maintenance of personnel and benefit records, payroll preparation and other general office procedures.

6. Charles Saunders-White, a Lawrence Leiter consultant, was first hired by the Company in 1974 to establish a policy and procedural manual for position evaluation, salary administration and performance appraisal.

7. Plaintiff was employed by the Company from June 28, 1976 to May 5, 1980.

8. From June 26, 1976 to December 11, 1977, plaintiff was a Specialist Clerk in the Insurance Department.

9. In 1976, Mr. Saunders-White studied the Company's entire organization and developed an organization plan, which was accepted by the Company in January, 1977.

10. Mr. Saunders-White also reviewed the Personnel and Industrial Relations Division from March to May, 1978.

11. Mr. Saunders-White's review resulted in a written audit report dated May, 1978.

12. Mr. Saunders-White developed a priority listing for his recommendations submitted in the audit report.

13. Mr. Saunders-White worked for the Company on numerous other occasions during the period of plaintiff's employment with the Company.

14. John Gotham was hired by the Company as Industrial Relations Manager on February 5, 1979.

15. Mr. Gotham authored a report entitled "Proposal and Recommendations for the Personnel and Industrial Relations Division" dated June, 1979.

16. Plaintiff made various requests for salary increases from December 12, 1977 to May 5, 1980.

17. Plaintiff received increases in salary which are as follows:

| | |
|---|---|
| December 12, 1977 | $ 775 per month |
| January 16, 1978 | $ 876 per month |
| July 3, 1978 | $ 946 per month |
| July 3, 1979 | $1,000 per month |

18. The employment of Mr. Joseph Simunac, Division Director of the Personnel and Industrial Relations Division, was terminated on July 6, 1979.

19. On July 9, 1979, John Gotham became Division Director of the Personnel and Industrial Relations Division and also became plaintiff's immediate supervisor, in which capacity he remained until January 2, 1980.

20. Plaintiff received a written evaluation from Mr. Gotham dated October 23, 1979.

21. The Company advertised for a Human Resources professional in the Kansas City Star on Saturday, November 11, 1979.

22. Mr. Gotham selected Mr. Rodney Newberry, a male, to become Manager—Compensation and Benefits.

23. Rodney Newberry was employed by the Company effective January 1, 1980.

24. On Wednesday, January 2, 1980, Mr. Newberry became plaintiff's immediate supervisor.

25. Mr. Newberry's salary was higher than the salary paid plaintiff.

26. The Company paid PMA membership dues for Debra Purviance and Rodney Newberry for 1980.

27. The Company did not pay plaintiff's PMA membership dues for the year 1980.

28. On Thursday, January 10, 1980, plaintiff began a medical leave of absence, which continued until May 5, 1980.

29. John Gotham made telephone calls to plaintiff while she was on medical leave from January 10, 1980 to May 5, 1980.

30. On April 30, 1980, plaintiff informed Mr. Newberry that she would be returning to work on May 5, 1980.

31. Plaintiff no longer worked for the Company after May 5, 1980.

32. Plaintiff filed a charge of employment discrimination with the Equal Employment Opportunity Commission on July 23, 1980.

33. Plaintiff filed her Complaint against the Company on July 22, 1982.

### B.

Both parties proposed a substantial number of findings which were based on particular paragraphs of the stipulated facts set forth above. Those proposed findings were, of course, admitted by opposing counsel. In addition, both parties proposed additional findings which were not based on the stipulation but which opposing counsel marked as "admitted" in accordance with the procedures described above.

Defendant's admissions of 39 findings proposed by plaintiff in plaintiff's April 1, 1983 filing as amended by plaintiff's April 6, 1983 filing, were, however, for the most part confined to plaintiff's proposed findings that were based on a particular paragraph of the stipulation. Defendant proposed 260 findings of fact in its April 1, 1983 filing. Defendant, proceeding in accordance with post-trial directions, with-

drew well over 100 of its proposed findings. Plaintiff admitted a small number of the remaining findings which were not based on the stipulation. Those admitted findings are therefore added to the undisputed facts stated in the stipulation and read as follows:[1]

34. (162) John Gotham did not know plaintiff would be going on medical leave of absence on January 10, 1980 when he advertised and interviewed for the Manager-Compensation and Benefits position.

35. (184) During his first week's employment, Rod Newberry made a preliminary recommendation that the wage and salary section be composed of a manager, a human resource analyst, a benefit supervisor, a benefit representative, and four secretaries.

36. (185) Rod Newberry's recommendations were incorporated into a facility plan forwarded to the administrative department by John Gotham.

37. (221) On February 6, 1980, plaintiff indicated that she would return to work on approximately March 15, 1980.

38. (222) On April 7, 1980, plaintiff indicated that she might return to work on May 5, 1980.

39. (244) Rodney Newberry hired Margaret Reardon as a Position Analyst effective July 16, 1980.

40. (245) Rodney Newberry placed Margaret Reardon in a Grade 12 salary level, at $975.00 per month.

41. (246) Margaret Reardon's job was eliminated effective December 4, 1981.

### III.

### A.

Careful examination of the stipulation agreed to by the parties and examination of the additional admitted facts above stated establishes that the factual agreements reached by the parties were based upon various exhibits introduced in evidence. It is therefore appropriate that we make additional findings based on that documentary evidence and the testimony of the witnesses which related to those exhibits.

Both sides introduced in evidence the May, 1978 report of Lawrence-Leiter and Company, an independent management consultant firm, of an audit of the operations of defendant's Personnel and Industrial Relations Division in North Kansas City. (Plaintiff's Exhibit 12; Defendant's Exhibit 11). In the introductory part of that report, it was stated that "the audit was directed toward an attempt to answer questions which had been raised such as 'What do they do up there?' and to ascertain the reasons for criticisms which had become persistent with regard to the services performed." The report also noted at the outset that J.A. Simunac was the incumbent Director of defendant's Personnel and Industrial Relations division.

The May, 1978 report stated the following overall appraisal of the manner in which Mr. Simunac had administered the division:

Overall, it appears to us that the Director has been trying to perform tasks related to compliance with the law which are very unpopular and frequently resisted, with an operating system and staff that requires much closer supervision than he is in a position to provide.

We are not optimistic that the present situation will change more than could be expected as the staff obtains more experience as time passes, nor do we believe that much progress will be made toward fulfillment of the many tasks listed in our recommendations unless the staff is given closer supervision.

---

1. The paragraphs of undisputed facts added to the stipulated facts are numbered to follow the numbered sequence of the paragraphs of the stipulation. The number in parenthesis following the newly numbered paragraphs of our findings of undisputed fact is the number of the paragraph contained in defendant's April 1, 1983 proposed finding of fact filing. It should be further noted that plaintiff, in making her admissions, also indicated that some of the admitted facts were "not relevant." We expressly overrule all of plaintiff's relevancy objections to the admitted findings of fact made in this part of our memorandum opinion.

The May, 1978 report stated that it "contains many recommendations because there is a great deal that needs to be done" and summarized its primary recommendation in the following language:

Our primary recommendation is that the Labor Relations Department Manager be replaced by a person with the capability to handle the Labor Relations functions and who could also provide direct supervision of the Wage and Salary Administrator and the Personnel—EEO Specialist.

The 1978 report thus forecast that Mr. Simunac was likely to be replaced and that the incumbent Wage and Salary Administrator was going to be placed under the direct supervision of other administrative personnel. In the description of the "Present Situation" of the Division Staff as it existed at the time the May, 1978 report was written, the report noted that the "Wage, Salary, and Benefit Administration Section Supervisor" had only five months experience in that position, having been transferred from another division on December 12, 1977. The work performed by that Supervisor was summarized as follows:

| | |
|---|---|
| Review, approve and update personnel records—approximately 1,000 items per month | 40% |
| Consultations and meetings with the supervisors and employees—approximately 200 per month | 40% |
| Employment verifications—approximately 160 per month | 5% |
| Auditing departments and evaluating positions | 10% |
| Other work | 5%[2] |

On page 39 of the 1978 report, the recommendation summarized in the introductory section of the report, which we have quoted above, was stated in the following detail:

We recommend that a replacement be found for the Labor Relations Department Manager. This replacement should be fully qualified to act as the potential successor of the present Director and be strong in Labor Relations and in the general administration of a Personnel Division. It is recommended that the replacement be given the functional responsibilities of the Labor Relations Department manager and *also* given direct supervision of the Wage, Salary and Benefit Administration Section and the direct supervision of the Personnel—EEO Specialist. Such an organization structure, with the right replacement, would assure strong supervision of these three (3) critical areas of responsibility. (Emphasis the report's).

On Page 40 of the 1978 report the following was stated with specific respect to the need for supervision of the plaintiff in her position as Supervisor of defendant's Wage, Salary and Benefit Administration Section:

This recommendation on the activities subordinate to a new Labor Relations Department Manager is strengthened by our belief that the incumbent Wage, Salary and Benefit Administration Section Supervisor and the Personnel-EEO Specialist are both somewhat lacking in the Job Specifications which we offer and have attached for each job. Because the incumbents do not have what we consider to be essential education and background, they will need close supervision to reach the level of professionalism regarded as lacking by many of those interviewed.[3]

---

2. Defendant's Exhibit 12 establishes that the plaintiff was transferred to the Personnel Division on December 12, 1977. See also plaintiff's Exhibit 3 which announced plaintiff's appointment to that newly created position dated December 15, 1977.

The percentage figures quoted above generally reflect the management consultant firm's acceptance of data prepared by plaintiff for use by that firm. See Plaintiff's Exhibit 14 and Defendant's Exhibit 10. That exhibit, of course, contained percentage estimates which totaled 183% plus. While there was considera-

ble discussion of that exhibit at trial, it is obvious that the 1978 report accepted plaintiff's estimate in regard to particular items set forth in the exhibit prepared by plaintiff and substituted a reduced percentage for items which resulted in a total of exactly 100%.

3. Plaintiff's application for employment, see Defendant's Exhibit 6, accurately reflected that she was a high school graduate; that she received a teaching certificate as the result of matriculation during the summer of 1943 in what was then Warrensburg Teachers College; that she attended Springfield Business College

The Job Specifications attached to the 1978 report provided that the person to be appointed as Corporate Wage and Salary Specialist should have the following technical requirements:

A. *Education*—Bachelor level, preferably Masters level, or equivalent degree. Education must include three college-level math. courses, one in statistics, a course or courses in logic, and business communications highly desirable.

B. *Work experience*—three to five years working as the No. 1 person in wage and salary in a small company or as the No. 2 person in a larger corporation. Must have been trained and have experience in the following:

1. Writing job descriptions.

2. Performing job evaluations.

3. Centralized administration of an established wage and salary program, preferably for all levels in the organization.

4. Desired but not required—being a part of establishing a new or revised program of wage and salary administration, which would include the development of all wage and salary policies and procedures.

5. Desired but not required—experience in other areas of personnel such as employment, labor relations, or training prior to specializing in wage and salary administration.

C. *Personal Background*—a background that shows an interest and aptitude for working with numbers and close detail. Desirable but not required—membership and active participation in the American Compensation Society, local compensation survey comparison roundtables, etc.

The Job Specification for the recommended EEO/AAP Corporate Compliance Officer were even more stringent, requiring a BS College degree at a minimum and preferably "work at the Masters level or an LLB." At least five years experience in personnel management was recommended for this position, as distinguished from three to five years recommended in regard to the Corporate Wage and Salary Specialist.

We find that the recommendations made in the May, 1978 report were not in any way discriminatorily directed against the plaintiff. We further find that the plaintiff did not have either the educational background or the work experience required for either of the new positions recommended by the 1978 report.

Defendant's Exhibit 12, a copy of the "Suggested priorities for action on the recommendations made in the report on the audit of operations of personal and industrial relations division" made the following recommendation as the first priority for action to be taken by the defendant:

1. Secure a replacement Labor Relations Department Manager and undertake an immediate and thorough evaluation of all contracts and development of a long-range plan and implementation strategy. Also, give the replacement Manager the responsibility of supervising the Wage, Salary and Benefit Administration Section and the Personnel and EEO Specialist. [D's Exh. 12, p. 1]

Consistent with that recommendation, defendant employed John Gotham to succeed

for one year and received a diploma from that institution; and that she was also presented a Standard Diploma by American Savings and Loan Institute for having completed various courses given by that institution. (Plaintiff's Exhibit 2 dates that diploma as of June 15, 1963 whereas her application gives 1966 as the date of that diploma.)

The information on plaintiff's application for employment in regard to her educational and work experience background is in quite sharp contrast with a resume prepared by plaintiff in May of 1979. See Defendant's Exhibit 17. Although it is obvious plaintiff's 1979 resume substantially inflated both her educational and work experience background, we do not make any specific finding in that regard other than to note that plaintiff did not have either the educational or work experience background to qualify for the new position contemplated by the 1978 report.

Joseph Simunac as Director of the Personnel and Industrial Relations Division. Defendant's Exhibit 18 is a copy of John Gotham's June, 1979 "Proposal and Recommendations for the Personnel and Industrial Relations Division," identified by the parties in paragraph 15 of their stipulation. John Gotham's Proposal and Recommendations made specific reference to "the Lawrence-Leiter report that was done in May of 1878" and commented that it was "very clear to all who have read that report that the overall impact of the Division itself is not very positive." In the section of his Proposal and Recommendations entitled "Specific Recommendations and Conclusions," John Gotham states that "I am proposing the addition of two professional-level managers ... one for Labor Relations and one for Wage and Salary Administration."

With specific reference to "Wage and Salary Administration," John Gotham commented that "there does exist a Wage and Salary Administration program at Cook Paint—but it is not really working the way I would like to see it work." He added that the Wage and Salary Administration was "more of a clerical, routine activity than it should be ... and I don't believe it is really contributing to the bottom line of the corporation as it should—partly because of the individuals involved in the administration of wages and salaries ... but also partly because of the system itself." John Gotham made the following specific recommendation in regard to Wage and Salary Administration:

I would recommend that a new Corporate Manager of Wage and Salary Administration be hired and be charged with the task of completely revamping our Wage and Salary Administration program.

This individual would probably have to have a minimum again of five (5) years experience in Wage and Salary administration—either as the # 2 man in a fairly large-size operation or # 1 man in an organization the size of Cook Paint.

The section entitled "Objectives & Action Plan," stated that:

A new Division Director needs to be appointed by July 6, 1979. The determination of Joe Simunac's status needs to be determined by July 9, 1979.

I hope to be able to hire a new Corporate Manager of Labor Relations by September 1, 1979.

I would also hope to be able to hire a new Corporate Manager of Wage and Salary Administration by September 1, 1979 also.

The Organization Chart proposed for the defendant's Personnel and Industrial Relations Division, attached to John Gotham's proposal and recommendation is reproduced on the following page of this memorandum opinion.

*PERSONNEL & INDUSTRIAL RELATIONS DIVISION*

It is to be noted that under the proposed Organizational Chart four "Corporate Managers" were to report directly to the Division Director. The Organizational Chart proposed that plaintiff would be classified as a "Wage & Salary Specialist" and that her position would be under the direct supervision of a new Corporate Manager for Wage & Salary Administration (New). That new Corporate Manager, like all the other three Corporate Managers proposed by the Organizational Chart, would be under the direct supervision of the Division Director. It is to be further noted that the recommendation of Joseph Simunac for the position of Corporate Manager for EEO/AAP Compliance was clearly a tentative recommendation; a question mark having been added after his name on the proposed Organizational Chart.[4]

The organizational chart introduced as Plaintiff's Exhibit 87 and as Defendant's Exhibit 38 reflects the employment and appointment of Rodney Newberry as the "Manager of the Compensation and Benefits" and reflects defendant's acceptance of the Organizational Chart attached to John Gotham's June, 1979 Proposal and Recommendations. By that time, Mr. Simunac had been terminated and, as paragraph 24 of the parties' stipulation states, Mr. Newberry became plaintiff's immediate supervisor on January 2, 1980.[5]

It should be noted that none of the various organizational charts discussed in footnote 5 ever carried the title of "Manager"

4. John Gotham made clear on page 14 of his Proposal and Recommendations that his recommendation of the position of Corporate Manager of EEO/AAP Compliance was a firm recommendation. He added, however, in regard to the person who should fill that position, the tentative language that "if acceptable to all concerned, this might be a position that Joseph Simunac can reasonably perform with proper direction." As stated above in the text, John Gotham's Action Plan firmly stated that "Joe Simunac' status needs to be determined by July 9, 1979." Paragraph 18 of the parties' stipulation accurately stated that "the employment of Mr. Joseph Simunac, Division Director of Personnel and Industrial Relations Division, was terminated on July 6, 1979."

5. The documentary evidence established that the exact title of plaintiff's position and where that position should be placed on an organization chart was not treated in an entirely consistent manner. For example, on December 15, 1977 Joseph Simunac announced plaintiff's appointment "to the newly-created position [of] Wage and Salary Administrator" (see Plaintiff's Exhibit 3). Plaintiff's employment record (P1's Exhibit 8, p. 2) also carried the same title of "Wage & Salary Administrator." That title, however, was inconsistent with the calling card printed for plaintiff which indicated that she was "Wage, Salary and Benefit Administrator" of defendant's "Personnel and Industrial Relations Division."

The inconsistency between Mr. Simunac's December 15, 1977 announcement of plaintiff's appointment was "Wage and Salary Administrator" and her calling card, which carried the title of "Wage, Salary, *and Benefit* Administrator," (emphasis ours) is not a significant factor in the determination of this case. The recommendations contained in the May, 1978 report, in the Suggested Priorities for Action established in regard to that report, and in John Gotham's June, 1979 Proposal and Recommendations were based on plaintiff's actual performance in the position she occupied rather than on the exact title that position might have carried.

In a similar manner, various of the organizational charts introduced in evidence revealed an insignificant inconsistency in regard to where the position of "Wage & Salary Administrator" should be placed on an organizational chart. Plaintiff's Exhibit 86, dated October, 1979 and Defendant's Exhibit 24, dated November, 1979, for example, placed the Supervisor of Sales Training and the Wage & Salary Administrator on the same apparent administrative level as that occupied by the Manager of Organization & Human Resource Development, and the Manager of Employee Relations EEO/AAP. A "Supervisor" and a "Manager" obviously did not belong on the same administrative level. See page 5 of Defendant's Exhibit 13, another organizational chart dated August, 1978, which described plaintiff's title as Supervisor of the Wage, Salary and Benefit Section, which placed that position on a level below that of the Manager of the "Labor Relations Department."

We therefore find that the placement of plaintiff as the Wage & Salary Administrator on the single level of two of the various organizational charts did not establish either the scope of plaintiff's duties or the manner in which those duties were performed. The organizational chart introduced as Plaintiff's Exhibit 87 and as Defendant's Exhibit 38 does have substantial evidentiary weight for the reasons stated in the text.

for any position ever occupied by the plaintiff. The August, 1977 organizational chart on page 5 of Defendant's Exhibit 12 actually described plaintiff's position as a "Supervisor." Plaintiff's Exhibit 5 and defendant's Exhibit 9 reflect the function of a "supervisor" of a section of defendant's Personnel and Industrial Relations Division as of September, 1977. Defendant's Exhibit 34, on the other hand, is a statement of the functions of the new position of "Manager of Benefits & Compensation" of the defendant's "Human Resources Division," the new name given to the old Personnel and Industrial Relations Division.

Plaintiff has argued, on the facts, that plaintiff's Exhibit 5, which relates to a 1977 position, and defendant's Exhibit 34, which relates to a position established in 1979, describe precisely the same position. Plaintiff accordingly presented a legal argument that defendant discriminated against her on the basis of sex when it employed Rodney Newberry to fill the newly created position of "Manager—Benefits & Compensation." We reject plaintiff's factual and legal arguments for the reason that we find that plaintiff's Exhibit 5 and defendant's Exhibit 13 describe entirely different positions and, in light of all of the other facts and circumstances in the case, it is clear that plaintiff was not qualified to be appointed to the position that Rodney Newberry was employed to fill. We further find that the position that Rodney Newberry was employed to fill was not in any way pretextual and was not created to conceal action taken by the defendant which would otherwise have been discriminatory.

The parties stipulated in paragraph 19 of their stipulation that after John Gotham became Director of the Division on July 9, 1979, he "also became plaintiff's immediate supervisor, in which capacity he remained until January 2, 1980." As stipulated in paragraph 24 of the parties' stipulation, Mr. Newberry became plaintiff's immediate supervisor on January 2, 1980. We find, however, that until Rodney Newberry was employed as the Manager of Compensation & Benefits, Mr. Gotham exercised the detailed supervision recommended in the May, 1978 report and in John Gotham's June, 1979 Proposal and Recommendations. Plaintiff's Exhibit 73, for example, is a longhand note from John Gotham to plaintiff dated September 5, 1979 which advised plaintiff that "I want to see everything that leaves the Department before it leaves." Plaintiff's Exhibit 67 is a memorandum from plaintiff to John Gotham dated October 23, 1979 in which she requested a conference "to discuss my job, position, performance duties and responsibility." Plaintiff noted that she had not been given an opportunity to discuss those matters since John Gotham had accepted the position of Director on July 6, 1979.

Quite by coincidence, John Gotham made a Performance Evaluation of plaintiff on the same date of her request. See Defendant's Exh. 22. Plaintiff was given satisfactory marks in John Gotham's October 23, 1979 evaluation on all matters except Part IV—Judgment, Part V—Initiative, and Part VI—Working Relations. She was given (1) a low mark, 1, on a scale of from one to ten (Frequent errors) in regard to Judgment; (2) a high mark, 9, on Initiative (Never had to be told); and (3) a 3 on "Has minimum ability to communicate" on Working Relations. Under the other Comments section, John Gotham stated "Too many errors in judgment. Frequent reports of discussions of wages & salary policies & actions with those that need not know." Plaintiff received an average five rating on Part VIII—Overall Evaluation.

Defendant's Exhibit 25, a copy of the advertisement identified in paragraph 21 of the parties' stipulation, made clear that the defendant was "looking for an individual who has a degree, preferably a Masters, in Personnel or Industrial Relations, Business Administration, or related major" and "who has a minimum of 5 to 10 years of professional generalist experience in a manufacturing environment."

Plaintiff's Exhibit 74 is a memorandum from John Gotham to plaintiff under date of December 10, 1979 which reflects the fact that plaintiff was subjected to a type

of supervision under John Gotham much stricter than what she was subjected to when Joseph Simunac was Director of the Division. Plaintiff's Exhibit 96 is a memorandum from Rodney Newberry dated five days after he began to act as Manager of the Compensation and Benefits department, which required weekly reports from the plaintiff and from Beverly Miller, secretary; and from Debbie Noble and Phyllis Frazier, specialist clerks, all three of whom had formerly reported to plaintiff in her capacity as Wage & Salary Administrator. All four persons were directed to file their reports on each Monday morning for the preceding week, the same to reflect the day to day activities of all four persons involved, and that the persons to whom Mr. Newberry sent the memorandum should plan on discussing the weekly report that afternoon.

The parties stipulated in paragraph 28 that the plaintiff went on medical leave of absence on January 10, 1980, which leave continued until May 5, 1980. Defendant's Exhibit 36, a memorandum dated February 6, 1980 from plaintiff, dictated over the telephone to John Gotham, establishes that plaintiff on both January 21 and January 30, 1980, assured John Gotham on the telephone that "I will keep you posted as to the approximate date I may be able to return to my job at Cook's, that is, to the best of my knowledge." She advised that she had seen the doctor on February 4, 1980 and that the cast would have to remain on plaintiff's foot and leg until March 15, 1980. She expected to return to the doctor on February 15, 1980 and that she would keep John Gotham informed. She concluded that dictated memorandum by stating:

Again, I am hopeful he will release me the last of March, so I may assume my duties. I certainly miss my job and everyone there. John, I will keep you advised on my condition.

Plaintiff's Exhibit 8, page 26, is another memorandum which plaintiff dictated to John Gotham by telephone, dated February 15, 1980. That memorandum reflects that she had talked with Rodney Newberry on Monday, February 11th, and that although the cast had to be replaced and would be required to stay on until the middle of March, "everything seems to be doing fine, but slow." Defendant's Exhibit 40 was a memorandum dated April 7, 1980 from plaintiff to Rodney Newberry which attached Dr. Robert T. Littlejohn's memorandum which advised that the plaintiff "may return to work 5–5–80."

The parties stipulated that on April 30, 1980 "plaintiff informed Mr. Newberry that she would be returning to work on May 5, 1980." On May 1, 1980, however, plaintiff wrote John Gotham (Rod Newberry) a letter, with copies to Pat Curran, Jim Florence, Bob Adams and Personnel File, in which she stated the following in the first opening paragraphs of that letter:

It is with deep regret that it has become necessary for me to terminate my position, Wage, Salary & Benefit Administrator, with Cook Paint and Varnish Co. This letter is to advise you the effective date of my resignation is 8 a.m., May 5, 1980.

It has been my sincere and honest intention to return to my position on 5–5–80. Since I will not be available for an Exit interview, the following facts are some of the reasons I have realized it would be impossible to create a satisfactory working environment in the Human Resources Division.

She then complained that "On Jan. 2, 1980, you had employed another Corporate Level Employee in the Human Resources Division to supervise me." She also complained that "Rod immediately began supervising my subordinates and was having private meetings with them." Plaintiff also complained that both Debbie Noble and Beverly Miller had resigned. (See Plaintiff's Exhibit 99 for a copy of Ms. Noble's February 14, 1980 letter of resignation; see Plaintiff's Exhibit 100 for a copy of Beverly Miller's February 18, 1980 resignation; and see Plaintiff's Exhibit 87 in regard to the positions occupied by Ms. Noble and Ms. Miller on the then current organizational chart.) She added that "Recently, I have spoken with Debbie

and Beverly and now I can understand why they left." Expanding upon the hearsay in regard to what Beverly Miller had told her some time after Miller had resigned on February 18, 1980, plaintiff stated that:

Beverly reported to me until Rod was employed—then she reported to Rod 90% of her time. Beverly stated in her letter the changing structure in the Human Resources Division had created an environment she could not work in. She had knowledge of future changes in my job position and to her there was no visible future for a woman in that Division.

She also complained about telephone calls that she had had with both John Gotham and Rodney Newberry.

We find that plaintiff's statement of what Beverly Miller told her after Beverly Miller had resigned in regard to Miller's alleged knowledge of future changes and that "there was no visible future for a woman" is the only written statement in the entire record that could be construed to support plaintiff's complaint that defendant's actions were motivated by defendant's discrimination against her for reason of her sex. We further find that such statement is not sufficient evidence, when considered together with all the other facts and circumstances of this case, to sustain plaintiff's ultimate burden of proof. Plaintiff's Exhibit 8, page 11, establishes that defendant's records showed that plaintiff's employment was terminated on May 5, 1980 for the reason that she had "resigned by letter 5/5/80 without notice." We find that defendant's recordation of the reason assigned for plaintiff's termination of employment was not pretextual.

Defendant's Exhibits 44 and 45 reflect that Peggy Reardon was employed as a "position analyst." The evidence establishes that she performed tasks similar to some of the tasks that plaintiff had performed before her resignation. Ms. Reardon's position was eliminated December 4, 1981 and Rodney Newberry's position was eliminated December 31, 1981. It is also undisputed that John Gotham's employment was terminated on August 26, 1981.

**B.**

The findings of fact above stated implicitly accept and implicitly reject a substantial number of the findings proposed by the respective parties. In this part of our memorandum opinion, for the sake of clarity, we shall expressly resolve the principal factual issues presented by various of the proposed findings of fact.

The proposed findings to which we make reference are contained in plaintiff's proposed amended findings filed April 7, 1983 and those contained in defendant's proposed findings of fact filed April 1, 1983.

In Plaintiff's Nos. 5 and 17a, plaintiff proposed that we find that she performed her duties as Wage & Salary Administrator in a satisfactory and competent manner throughout the entire period of time she held that position from December 12, 1977 until May 5, 1980. We find that the greater weight of the credible evidence does not support plaintiff's proposed findings. Rather, we find that plaintiff was given a satisfactory performance evaluation until she was evaluated by John Gotham on October 23, 1979. We find, generally consistent with defendant's proposed No. 98, that John Gotham concluded that plaintiff was not capable of performing on a managerial, as distinguished from a supervisory, level and that his evaluation and conclusion were consistent with the recommendations contained in the May, 1978 audit report; with his own recommendations contained in his June, 1979 Proposal and Recommendations; and with his own observation of the plaintiff gathered from the time he became Director of the Division in July, 1979 up to the time he made his written evaluation on October 23, 1979.

We further find, generally consistent with defendant's proposed Nos. 101, 102 and 122, that John Gotham was satisfied that plaintiff could perform the administrative duties incident to the Wage & Salary Administrator position if appropriately supervised by the person to be appointed to the newly created position of Manager of Compensation and Benefits, to whom plaintiff

would report. We further find that John Gotham recommended that plaintiff retain her then current salary and that she be eligible for increases in salary, which she in fact received.

We further find, generally consistent with defendant's proposed Nos. 161, 162, 167 and 170, that John Gotham interviewed two men and two women for the newly established position of Manager of Compensation and Benefits; that he did not know that plaintiff would be going on a medical leave of absence when he placed the advertisement for the new position in the Kansas City Star on November 11, 1979; that he selected Rodney Newberry as the most qualified candidate for the new position of Manager of Compensation and Benefits; and that in doing so he was merely carrying out the recommendations of the May, 1978 audit report of the independent consulting firm, and his own June 19, 1978 Proposal and Recommendations with respect to the staffing of the Division of which he was Director.

We further find, generally consistent with defendant's proposed Nos. 170, 186, 224 and 225, that John Gotham's employment of Rodney Newberry, the same to be effective on January 2, 1980, was not for the purpose or with the intent of terminating plaintiff's employment with the defendant; that the various recommendations made concerning expansion of the physical facilities of the Division were not in any way intended to terminate, nor did they, in fact, reflect a termination of plaintiff's employment; and that both John Gotham, as Director of the Division, and Rodney Newberry, as Manager of the Compensation and Benefits, fully expected the plaintiff to return to work following her medical leave of absence.

Plaintiff's Nos. 23 and 24 proposed that we find that after Rodney Newberry became Manager of Compensation and Benefits on January 2, 1980, he "assumed all of plaintiff's responsibilities" and assumed plaintiff's position at her "former management level" in the Division. The evidence sustains neither of those proposed findings.

The greater weight of the evidence establishes that the plaintiff's responsibilities as Wage & Salary Administrator were substantially reduced from the time of Joseph Simunac's termination as Director of the Division on July 6, 1979 and John Gotham's appointment to that position on July 9, 1979. We further find that defendant's reduction of plaintiff's responsibilities was not made on any pretextual ground to conceal any discriminatory action taken by defendant against plaintiff on the ground that she was a female.

Plaintiff's proposed finding Nos. 11a (added in plaintiff's April 7, 1983 filing), 14, and plaintiff's proposed finding No. 32 proposed that we find that defendant's "general policy and atmosphere" was "unfavorable to females in management;" that defendant "had a policy to harass females exclusively;" that "John Gotham verbally harassed and humiliated plaintiff during working hours;" and that John Gotham further harassed and humiliated plaintiff when he made various telephone calls to her while she was on medical leave.

We find that the evidence does not support plaintiff's proposed findings. Rather, we find, generally consistent with defendant's Nos. 206, 207, 215 and 216, that John Gotham did not use abusive language either to plaintiff or any other women in defendant's employ; that he did not speak derogatorily of any female employee; and that he neither harassed, humiliated or intimidated plaintiff when he talked with her on the telephone when she was on medical leave of absence. We further find that the greater weight of the evidence does not sustain plaintiff's proposed finding that there was some sort of a "general policy and atmosphere" unfavorable to females in general or to plaintiff in particular.

We now resolve a number of minor disputes presented by the parties' proposed findings. Plaintiff's Nos. 11, 12 and 26 presented the question of whether John Gotham's curtailment of plaintiff's travel; his alleged denial of her request to purchase a Prentice-Hall publication; and defendant's refusal to pay plaintiff's membership

dues to the Personnel Management Association (PMA) for the year 1980, occurred because of her sex. We find, generally consistent with defendant's proposed Nos. 80 and 136, that plaintiff was not prohibited from travel because of her sex and that she was not denied permission to order the Compliance Manual because of her sex; nor did defendant refuse to pay plaintiff's PMA dues because she was a female.

While the question of whether defendant constructively discharged plaintiff may be a mixed question of fact and law, we expressly find that plaintiff did not carry the burden of proving that she was in fact constructively discharged.

## IV.

### A.

This Title VII case, like most, turns on its facts rather than on the resolution of disputed questions of law. Both sides properly recognize that the standards under which a plaintiff may be said to establish a prima facie case are stated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). On April 4, 1983, on the very day we commenced the trial of this case, the Supreme Court, in its decision in *United States Postal Service Board of Governors v. Aikens,* —— U.S. ——, 103 S.Ct. 1478, 75 L.Ed.2d 403, 1983, without dissent, reaffirmed what Justice Blackmun described in his concurring opinion, as the framework established by *McDonnell Douglas.*

Nor are the parties in disagreement in regard to the standards under which a Title VII plaintiff may establish a prima facie case of constructive discharge. While the parties do not cite the same cases in regard to the constructive discharge question presented, the cases which are cited articulate the same principles of law.

The standard quoted from *Young v. Southwestern Saving and Loan Association,* 509 F.2d 140 (5th Cir.1979), in plaintiff's proposed conclusion of law No. 14, is the standard frequently quoted and recognized by the cases dealing with constructive discharge questions. *Slotkin v. Human Development Corp. of Metropolitan,* 454 F.Supp. 250 (E.D.Mo.1978), cites *Young* with approval in finding that the evidence established a voluntary resignation rather than a constructive discharge. The Eighth Circuit in *Johnson v. Bunny Bread Co.,* 646 F.2d 1250 (8 Cir.1981), cited the Eastern District of Missouri's *Slotkin* opinion with approval. *Bunny Bread* also directed attention to *Thompson v. McDonnell-Douglas Corp.,* 552 F.2d 220 (8 Cir.1977), in which the Eighth Circuit rejected a constructive discharge claim. *Thompson,* however, cited *Young* with approval and in support of its conclusion that "the doctrine of constructive discharge developed in labor cases is applicable to civil rights cases."

It is thus obvious that the parties agree on the standard of law applicable to constructive discharge cases but disagree in regard to the application of that standard to the factual circumstances of this case. Although we entertained a substantial doubt in regard to whether the plaintiff made a prima facie case within the *McDonnell-Douglas v. Green* framework or within the standards applicable to constructive discharge, we did not make a definitive ruling in that regard during the trial of this case. Rather, we permitted the parties to adduce all evidence which both sides deemed relevant under the circumstances. Consistent with our general practice, we resolve any doubt about whether plaintiff may have made a prima facie case in favor of the plaintiff, particularly in light of plaintiff's admission in her proposed conclusion of law No. 9 that "defendant has articulated a legitimate reason for the rejection of plaintiff, i.e., that Rodney Newberry was better qualified for the position than plaintiff."

We thus reach the question of whether plaintiff carried the ultimate burden of proving that the legitimate reason articulated by the defendant was, or was not, "merely a pretext for illicit discrimination," as plaintiff would have this Court conclude

under all of the facts and circumstances of this case. We conclude that plaintiff did not carry that burden under the findings of fact above stated.

We conclude that we can accept only the three following conclusions of law proposed by the plaintiff:

1. This Court has jurisdiction of this case pursuant to 42 U.S.C. § 2000e–5(f)(1) and 2000e–5(f)(3). This action is properly before the Court under 42 U.S.C. § 2000e–5(f)(3). All procedural requirements of 42 U.S.C. § 2000e–(f)(1) have been met.

2. Defendant Cook Paint & Varnish Company is a proper Defendant within the meaning of 42 U.S.C. § 2000e.

3. (6) John Gotham was, at all times mentioned herein, an employee of Defendant, Cook Paint & Varnish Company. Defendant, Cook Paint & Varnish Company is liable for the actions of John Gotham which excluded Plaintiff from consideration as Manager-Compensation & Benefits.

We further conclude that the following conclusions proposed by defendant should be made under all of the facts and circumstances of this case:

4. (1) Defendant did not constructively discharge plaintiff.

5. (2) Defendant did not discriminate against plaintiff on the basis of sex in notation of 42 U.S.C. § 2000e, *et seq.*

6. (3) Plaintiff is not entitled to any monetary or injunctive relief.

### B.

For the sake of clarity, we state that plaintiff's proposed conclusion of law No. 3 is refused on the facts for the reason that we have found and concluded that plaintiff did not establish that "she was a female qualified for the job of Manager-Compensation and Benefits." We reject plaintiff's proposed conclusion No. 4 for the reason that, under the facts, we have found that the defendant did not establish that the plaintiff was not qualified for the position of Manager-Compensation and Benefits. Plaintiff's proposed conclusion No. 5 may not be made because we have found that plaintiff's duties as the Wage & Salary Administrator were not the same or substantially similar to the duties to be performed by the person employed in the newly created position of Manager-Compensation and Benefits.

Plaintiff's proposed conclusion No. 7 is rejected, on the facts, in light of our finding that the evidence failed to establish an "atmosphere of sex discrimination and prejudice against females." Plaintiff's proposed conclusion No. 8 is rejected in light of our finding that John Gotham did not make derogatory remarks to the plaintiff about women and that he did not evidence any unwillingness to hire or promote women as managers. Plaintiff's conclusion No. 9 is rejected for the reason that we have found and now conclude that the legitimate reason articulated by the defendant in regard to its employment of Rodney Newberry was not pretextual in nature.

Plaintiff's proposed conclusion No. 10 is rejected for the reason that we conclude that defendant's promotional system was not discriminatory against females. Plaintiff's proposed conclusion No. 11 is rejected because we have found, on the facts, that plaintiff did not suffer any "inconvenience, unfairness [or] humiliation of discrimination. Plaintiff's proposed conclusion No. 12 is rejected because we cannot find, on the facts, that any alleged "revamping" was operated in any discriminatory manner with respect to females.

Defendant's proposed conclusions Nos. 13 and 14, relating to constructive discharge, as is apparent from our conclusion No. 4 above stated, is rejected on the facts. Plaintiff's proposed conclusion Nos. 15 and 16, which related to the relief to which a successful plaintiff might be entitled, are rejected for the reason that we conclude that judgment must be entered for the defendant.

For the reasons stated, it is

ORDERED (1) that our findings of facts and conclusions of law stated in our memorandum opinion shall be considered as findings and conclusions made pursuant to Rule

52(a) of the Rules of Civil Procedure. It is further

ORDERED (2) that, in accordance with Rule 58 of the Rules of Civil Procedure, the Clerk shall prepare and set forth on a separate document an appropriate judgment for the defendant. The Clerk shall consult with counsel for both sides as to the form of judgment before the same is entered.