**Fred POINDEXTER, Plaintiff,**

v.

**KANSAS CITY, MISSOURI WATER DEPARTMENT, et al., Defendants.**

**No. 83–0171–CV–W–1.**

United States District Court,
W.D. Missouri, W.D.

Oct. 28, 1983.

---

Samuel I. McHenry, Legal Aid of Western Mo., Kansas City, Mo., for plaintiff.

Dan G. Jackson, III, Asst. City Atty., Kansas City, Mo., for defendants.

## MEMORANDUM OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN W. OLIVER, Senior District Judge.

### I. Introduction

This employment discharge discrimination case was maintained under both Title VII, 42 U.S.C. § 2000e–5(f) (Count I of plaintiff's complaint), and Section 1981, 42 U.S.C. § 1981 (Count II of plaintiff's complaint). Jury trial was waived in regard to plaintiff's Section 1981 claim.

Both parties, in accordance with this Court's pretrial order, filed proposed findings of fact and proposed conclusions of law. The number of issues of disputed fact was substantially decreased by the parties' commendable compliance with this Court's standard post-trial "cross-fire" order which directed each party to indicate which paragraphs of opposing counsel's proposed findings of fact were admitted and which paragraphs of opposing counsel's proposed findings of fact were denied. The undisputed findings of facts will be stated in part II of this memorandum opinion. The notation "[Denied]" following a particular paragraph number in part II reflects defendant's denial of that particular paragraph of plaintiff's proposed findings of fact. The material disputed factual issues created by such a denial will be resolved in part III of this memorandum opinion.

Determination of the case was also facilitated by defendant's appropriate recognition, as evidenced by paragraph 1 of defendant's proposed conclusion of law, that plaintiff made out a prima facie case of discrimination under the standards stated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).[1]

We find and conclude that plaintiff is entitled to appropriate equitable and legal relief under Title VII and Section 1981 and an award of attorney's fees. Appropriate orders will be entered directing further proceedings in regard to the entry of a final judgment.

### II. Undisputed Findings of Fact

Defendant, in compliance with this Court's post-trial "cross-fire" order, admitted that the following paragraphs of plaintiff's proposed findings of fact were established by a preponderance of the evidence:

1. Plaintiff Fred Poindexter is a Black adult male, United States citizen and resident of Kansas City, Missouri.

2. Plaintiff was employed by defendant Kansas City, Missouri, a municipality, from June 26, 1981 to August 12, 1981 as an electrician working in its Water Department.

3. Approximately one month after plaintiff was employed by defendant he received

---

1. Neither side cited the Supreme Court's most recent Title VII opinion in *U.S. Postal Service Bd. of Govs. v. Aikens*, —— U.S. ——, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), decided April 4, 1983. That case, which discusses the question of how "the *McDonnell-Burdine* presumption" should be treated by a district court, will later be discussed in more detail in part III, B of this memorandum opinion.

an initial job performance evaluation from defendant, dated July 28, 1981.

4. This July 28, 1981 evaluation, entitled "Employee Performance Report," was the only evaluation of plaintiff's job performance completed by defendant during plaintiff's tenure.

5. In that Employee Performance Report, defendant rated plaintiff's "General Performance" as "satisfactory."

6. Inclusively, that Employee Performance Report rated plaintiff as follows in each sub-category or "trait:"

Quality of work—satisfactory
Work output—satisfactory
Work habits—marginal
Safety—satisfactory
Personal relations—satisfactory
Adaptability—satisfactory

7. On the 10th of August, 1981, plaintiff went into the secondary control room to use the telephone.

8. When plaintiff picked up the phone, he heard a voice on the telephone and assumed someone was calling in. Plaintiff then told plant operator Harold Belcher (White) that someone was on the line.

9. Belcher, a non-supervisory employee, took the phone and told plaintiff he was not allowed to use the phone at any time and to stay out of the secondary control room.

10. [Denied]

11. [Denied]

12. [Denied]

13. [Denied]

14. John Barr (White), a maintenance employee present in the secondary control room, then stepped between plaintiff and Belcher. Barr and plaintiff then left the secondary control room.

15. Following the altercation between plaintiff and Belcher, defendant took statements from plaintiff, Belcher and Barr, the only witnesses to the August 10, 1981 incident.

16. [Denied]

17. As a result of the altercation between plaintiff and Belcher, plaintiff was discharged, while Belcher was not disciplined in any manner.

18. At the time of plaintiff's discharge, he was a probationary employee without grievance or appeal rights.

19. [Denied]

20. [Denied]

21. During the year 1981, defendant's Water Department, where plaintiff was employed, discharged four employees for misconduct or insubordination. All of the discharged employees were Black.

22. Defendant's EEO-4 report for 1981 covering "utilities and transportation" (a category which includes the Water Department as well as other related departments) shows the following:

| | |
|---|---|
| Total full time employees— | 1038 |
| Total full time black employees— | 478 |
| Total full time white employees— | 540 |

23. Minimum salary paid "Electrician I" since August, 1981 is as follows:

| | | |
|---|---|---|
| August, 1981 to May, 1982— | $1,176 | (per month) |
| May, 1982 to May, 1983— | 1,229 | |
| May, 1983 to date— | 1,284 | |

24. Plaintiff filed a charge of employment discrimination against defendant with the Equal Employment Opportunity Commission (EEOC).

25. [Denied]

26. [Denied]

27. [Denied]

28. [Denied]

In addition, plaintiff, in his post-trial "cross-fire" to defendant's proposed findings of fact, admitted four of the seven paragraphs of defendant's proposed findings of fact. Those admitted paragraphs were as follows:

1. Plaintiff, a Black male, was employed by defendant as an Electrician I for forty-eight (48) days from July 26, 1981 through August 12, 1981.

2. [Denied]

3. Plaintiff timely filed a charge of employment discrimination against defendant with the United States Equal Employment Opportunity Commission who determined that "some" of plaintiff's charge was true, issued a determination and finally issued a right to sue letter. (Plaintiff's Request for Admissions, Paragraphs 3, 5 and Court File)

4. Plaintiff was a probationary employee, having only worked for defendant forty-eight (48) days and as such had not yet accrued permanent status under defendant's Charter, Administrative Code, Personnel Rules or Memorandum of Understanding with Local 500 of the American Federation of State, County and Municipal Workers. Rule X of the Personnel Rules, Article IX Section 2 of the Memorandum of Understanding)

5. [Denied]

6. [Denied]

7. Defendant did not discipline the fellow worker.

As stated above, the disputed issues of fact identified by the respective cross-fire denials of the parties will be resolved in the next part of this memorandum opinion.

### III. *Resolution of Disputed Issues of Fact*

#### A.

Defendant, in accordance with the basic allocution and order of presentation of proof set forth in *McDonnell Douglas*, as further explained in *Burdine*, adduced evidence to rebut the presumption of discrimination created by plaintiff's conceded establishment of a prima facie case of disparate treatment. Paragraph 5 of defendant's proposed findings of fact, which stated that "Plaintiff was terminated from employment with Defendant for striking a superior fellow worker and for failure to adequately meet probation evaluation," accurately reflected defendant's basic factual defense to plaintiff's claims.[2]

Plaintiff, in recognition of *Burdine*'s holding that "the ultimate burden of persuading the trier of the fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff" (450 U.S. at 253, 101 S.Ct. at 1093), adduced evidence to show that the defendant's "proffered explanation is unworthy of credence" (450 U.S. at 256, 101 S.Ct. at 1095).

Paragraph 19 of plaintiff's proposed findings of fact, which stated that: "The disparate treatment accorded plaintiff and Belcher shows that race was the motivating factor in the decision to discharge plaintiff," and paragraph 20 of plaintiff's proposed findings of fact which stated "defendant's contentions that plaintiff's discharge was caused by something other than the single incident on August 10, 1981, initiated by Mr. Belcher, is shown to be pretextual by (A) plaintiff's performance evaluation and (B) the timing of defendant's alleged complaints concerning other elements of plaintiff's job," accurately reflect plaintiff's factual response. Plaintiff contends, in accordance with the framework of *McDonnell Douglas*, that the defendant's stated reason for discharge "was in fact pretext" (411 U.S. at 804, 93 S.Ct. at 1825), and that "the presumptively valid reasons for his [discharge] were in fact a cover-up for a racially discriminatory decision" (411 U.S. at 805, 93 S.Ct. at 1826).[3]

---

**2.** Paragraph 2 of defendant's proposed findings of fact, which stated that "Plaintiff was involuntarily discharged from his employment with Defendant after striking a supervisory employee" and paragraph 6 of defendant's proposed findings of fact, which stated that "There was no intentional racial animus connected with Plaintiff's discharge by Defendant," reflect more particular details of the basic factual defense presented by defendant in its effort to rebut plaintiff's conceded establishment of a prima facie case of discriminatory discharge.

**3.** Plaintiff's proposed findings of fact Nos. 10, 11, 12, 13, and 14 all relate to the details of what happened immediately after plaintiff and Belcher admittedly got into an argument about plaintiff's attempted use of the telephone and the time John Barr admittedly stepped between plaintiff and Belcher.

Those five paragraphs of plaintiff's proposed findings of fact are entirely consistent with the more detailed findings of fact stated later in the text. Our decision to make more detailed findings of fact in our own language is not to be

Our determination of this case requires that we proceed in accordance with our understanding of the gloss that *U.S. Postal Service Bd. of Govs. v. Aikens*, — U.S. ——, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) added to the gloss that *Burdine* added to the principles stated in *McDonnell Douglas*. *Aikens* stated that district courts must decide "the ultimate factual issue" of "whether the defendant intentionally discriminated against the plaintiff" (— U.S. p. ——, 103 S.Ct. p. 1482). "In short," in the language of *Aikens*, this "district court must decide which party's explanation of the employer's motivation it believes" (p. ——, 103 S.Ct. p. 1482).

We believe it is appropriate that we state in some detail the reason why we have stated the ultimate factual issues for decision in the language of *Aikens*. We do so in the next part of this memorandum opinion.

### B.

We recognize, of course, that *Aikens*, quoting a part of a footnote from *Burdine* (450 U.S. at 255, n. 10, 101 S.Ct. at 1095, n. 10) stated that at a particular "stage" in the trial of a Title VII case "the *McDonnell-Burdine* presumption 'drops from the case.'" Justice Blackmun's concurring opinion in *Aikens*, in which Justice Brennan joined, anticipated that the Court's opinion in *Aikens* could be read in more ways than one. Justice Blackmun stressed that his joinder was based on the fact that, "as I read its opinion, the Court today reaffirms the framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 [93 S.Ct. 1817, 36 L.Ed.2d 668] (1973) for Title VII cases."

This Court decided *Brandon v. Cook Paint & Varnish Co.*, 562 F.Supp. 1244 at 1257 (W.D.Mo.1983) and *Cooper v. Cook Paint & Varnish Co.*, 563 F.Supp. 1146 (W.D.Mo.1983), without the benefit of guidance from the Eighth Circuit in regard to how *Aikens* should be read. In both those

cases, consistent with Justice Blackmun's concurring opinion in *Aikens*, we concluded that the Supreme Court did no more in *Aikens* than reaffirm the framework of *McDonnell Douglas*.

The Eighth Circuit has cited *Aikens* in four cases since this Court decided *Cooper* and *Brandon*. In its per curiam opinion in *Wagh v. Nimmo, Director of the Veterans Administration*, 705 F.2d 1020 (8th Cir. 1983), *Aikens* was cited to support the Court of Appeals' conclusion that the district court's finding "on the ultimate factual issue in the case ... that the Veterans Administration had not intentionally discriminated against Dr. Wagh" was not clearly erroneous. *Id.* at 1021. In much the same manner, the Eighth Circuit's per curiam opinion in *Marafino v. St. Louis County Circuit Court*, 707 F.2d 1005 at 1006 (8th Cir.1983) did no more than quote the language from *Aikens* which stated that "the district court must decide which party's explanation of the employer's motivation it believes."

The Eighth Circuit's opinion in *Bell v. Bolger*, 708 F.2d 1312 (8th Cir.1983), however, suggests that the appellant in that case apparently argued that *Aikens* should be read in a manner different from the manner Justice Blackmun stated he read that case in his concurring opinion. *Bell* made clear that the district court had concluded that the plaintiff established a prima facie case of discrimination under the *McDonnell Douglas* standard.

The Eighth Circuit, in affirming the district court's action in that regard, concluded that "although the Supreme Court has recently indicated that whether a prima facie case is established is of less importance once a case is fully tried, *see Aikens*, *supra*, — U.S. at ——, 103 S.Ct. at 1481,[7] we hold that in this case the district court correctly determined that Bell had established a prima facie case." *Id.* at 1317. In footnote 7, page 1317, appended to its citation of *Aikens*, *Bell* noted that the opinion

considered as a rejection of the substance of the findings of fact proposed by the plaintiff in

those paragraphs.

of the Court in *Aikens* "reframed" the question actually decided by the Court of Appeals for the District of Columbia "by diminishing the importance of whether a prima facie case was met once a case was fully tried on the merits." The *Bell* footnote 7 also noted, consistent with the manner this Court read *Aikens* in *Brandon* and *Cooper*, that "Justice Blackmun's concurring opinion ... emphasized that the *McDonnell Douglas* framework remained applicable in Title VII cases."

*Wells v. Gotfredson*, 709 F.2d 493 (8th Cir.1983), was decided the same day as *Bell* was decided, but by a different panel of the Court of Appeals. The majority opinion, written by Judge Ross, concluded that "the district court erred in holding that Wells did not make out a prima facie case of sex discrimination." *Id.* at 495. Although the majority opinion clearly reflected that the *McDonnell Douglas-Burdine* standards were applicable, *Aikens* was relied upon to support an affirmance of the district court.

Chief Judge Lay filed a dissenting opinion in which he stated "on petition for rehearing Judge Ross has amended his opinion in light of the Supreme Court's recent decision in *United States Postal Service Board of Governors v. Aikens*, — U.S. ——, 103 S.Ct. 1478, 75 L.Ed.2d 403 (U.S.1983)." Chief Judge Lay further stated that "Unfortunately, this case now assumes vital importance in all discrimination cases in this circuit" and expressed the fear that "the effect of the majority opinion lends the appearance to the idea that trial courts in this circuit may now credit a nondiscriminatory reason articulated by a defendant employer without giving any weight or credence to the inference established by a plaintiff's proof of a prima facie case." *Id.* at 499.

Judge Ross, writing for the majority in *Wells*, responded to the fear expressed in Chief Judge Lay's dissenting opinion by stating in footnote 1 on page 496 of 709 F.2d that: "Contrary to the belief expressed in the dissent, trial courts in this circuit may not credit a defendant's nondiscriminatory reason without giving weight

or credence to the logical inference of discrimination established by the plaintiff's prima facie evidence." The majority opinion in *Wells* stated the post-*Aikens* standard to be followed by the district courts in the Eighth Circuit in the following language in that same footnote:

> When the defendant produces evidence of a legitimate, nondiscriminatory reason for its actions, that mandatory presumption drops from the case *but the logical inference of discrimination arising from the prima facie evidence remains.* As in *Aikens, that prima facie evidence must be considered by the trial court and must be given "whatever weight and credence it deserves" in light of the defendant's rebuttal evidence.* United States Postal Service Board of Governors v. Aikens, — U.S. at —— n. 3, 103 S.Ct. at 1481 n. 3. (Emphasis ours) [709 F.2d at 496 n. 1]

In order to avoid whatever confusion that may have been introduced in the trial of a routine Title VII case by *Aikens'* statement that an established *McDonnell-Burdine* presumption of intentional discrimination "drops from the case," we have framed the factual issue for determination in accordance with *Aikens'* language that we must decide "which party's explanation of the employer's motivation it believes," in our determination of "the ultimate factual issue" of "whether the defendant intentionally discriminated against the plaintiff."

We also state that we make our ultimate factual finding of intentional discrimination on the basis of the weight and credibility of all the direct and circumstantial evidence in the case and that our ultimate finding, although consistent with the once unquestioned *McDonnell Douglas* presumption, is not dependent on our treatment of the defendant's concession that plaintiff did, in fact, establish a prima facie case of intentional discriminatory discharge.

We expressly find that under all the facts and circumstances of this case plaintiff established by the preponderance of all the credible evidence that defendant's explanation was pretextual and that defend-

ant intentionally discriminated against the plaintiff when it purported to discharge him for the reason it assigned. In short, we find that defendant's explanation of its motivation in discharging the plaintiff was pretextual and was unworthy of credence.

## C.

Defendant's factual contention that plaintiff was, in fact, discharged because of his alleged "failure to meet probationary evaluations," as defendant proposed we find in one portion of paragraph 5 of its proposed findings of fact, was removed from the area of disputed fact by defendant's cross-fire admission that plaintiff "received an initial job performance evaluation" on July 28, 1981 (see our finding of fact No. 3 in Part II above). Defendant's cross-fire further admitted that this evaluation was "the only evaluation of plaintiff's job performance completed by defendant during plaintiff's tenure" (see our finding No. 4 in Part II above) and that this "Employee Performance Report," rated plaintiff's "General Performance" as "satisfactory" (see our finding of fact No. 5 in Part II above).

All three of those admitted findings of fact, together with admitted finding of fact No. 6 in part II above, were based on and are supported by Plaintiff's Exhibit No. 1. Defendant, in light of that contemporaneous exhibit, could not do anything other than admit that plaintiff's proposed findings of fact Nos. 3, 4, 5 and 6 were true.

Plaintiff's Exhibit No. 1, showed on its face that it was to be completed for all probationary employees of defendant's Water Department. Both the probationary employee's "Rater" and the "Rater's Supervisor" were specifically instructed as follows in regard to how one of the four boxes: "Optimal," "Better," "Satisfactory," or "Unsatisfactory" should be checked in regard to their bottom line "General Evaluation" of the probationary employee's job performance:

Indicate by an (x) in the appropriate box your own general evaluation of the employee's rating, taking all the above and other pertinent factors into consideration. A written statement must be made on the reverse side of this form if the rating is Optimal or Unsatisfactory on this item. Carbon paper must be used when using reverse side.

No written statement was made on the reverse side of the form. Rather, Perry Thompson, plaintiff's Rater, with the approval of Paul E. Heald, the Rater's Supervisor, simply put an "x" mark in the "Satisfactory" box on Plaintiff's Exhibit No. 1. Plaintiff, as part of the evidence adduced to support his factual claim of pretext, introduced Plaintiff's Exhibit 12 in evidence. That exhibit purported to be an Inter-Department Communication from the same Perry Thompson to plaintiff's Personnel File. That memorandum carried a typewritten date of "October 10, 1981," a date long after plaintiff's discharge. The "October 10, 1981" typewritten date, however, was changed in long hand by "P.E. Heald" from "October 10, 1981" to "*August* 10, 1981," the very day on which the incident in the control room occurred.

Although plaintiff's personnel file contained a memorandum dated July 1, 1981, which reflected that plaintiff had received an oral reprimand for being late to work on June 30, 1981, and a second memorandum dated July 10, 1981, which reflected that plaintiff had received a written reprimand for "reporting late to work a second time," it is undisputed that the lengthy October/August 10, 1981 memorandum which purported to describe an incident which allegedly occurred on July 31, 1981, was not written up until after defendant was investigating the August 10, 1981 incident which led to plaintiff's discharge.

We find that the circumstances relating to the manner in which Plaintiff's Exhibit No. 12 was prepared and defendant's treatment of that memorandum in its effort to justify plaintiff's discharge, support our finding of pretext.

Plaintiff's Exhibit No. 15 contains additional evidence which supports our finding that defendant intentionally attempted to use the belatedly prepared October/August

10, 1981 memorandum as a pretext for its discharge of plaintiff. That exhibit was an Inter-Department Communication dated March 24, 1982 from D. Ted Weis, Chief, Plant Maintenance Division—Water Department, to one Dan Randle, Assistant to the Director—Personnel Department. Mr. Randle had obviously made inquiry concerning plaintiff's discharge.

The first paragraph of that memorandum accurately stated that:

Mr. Poindexter worked for the Plant Maintenance Division from June 26, 1981 to August 12, 1981. During this period, he received an oral and written reprimand for tardiness. He received one in-house rating after one month service, and although he was rated satisfactory overall, he was rated marginal in work habits.

The second paragraph of that memorandum, however, stated that:

During the short period that he was employed, he had at least one verbal altercation with his supervisor, (copy of file memo attached), as well as some related problems with his fellow workers.

The "(copy of file memo attached)," of course, was a copy of the belatedly prepared October/August 10, 1981 memorandum (Plaintiff's Exh. No. 12).

We find that there is no credible evidence in the record to support a finding that either Mr. Weis or anyone else in defendant's employ ever had any knowledge that plaintiff had, in fact, experienced "some related problems with his fellow employees." Indeed, Plaintiff's Exhibit No. 1, plaintiff's job evaluation form, shows that Perry Thompson and Paul E. Heald specifically rated and approved plaintiff's "Cooperation with fellow employees" and plaintiff's "Ability to get along with others" as "Satisfactory." It is obvious that Mr. Thompson did not attach any particular significance to the July 31, 1981 incident which was the subject of his October/August 10, 1981 memorandum, or else he would have sent a memorandum to plaintiff's personnel file in the same prompt manner that he sent memoranda to report

the fact that plaintiff was late to work on two separate days. We find that defendant's effort to explain the belated preparation of the October/August 10, 1981 memorandum to be unworthy of credence.

The third paragraph of Mr. Weis' March 25, 1982 memorandum to Mr. Randle stated:

As we discussed, the main reason for his dismissal was the punching incident with Mr. Belcher. (Copies of file memos concerning this incident are also attached). In view of the problems already encountered during his short tenure and the severeness of the fighting episode, we felt it was in our best interests to terminate Mr. Poindexter immediately.

The "(copies of file memos concerning this incident are also attached)" were copies of the August 11, 1981 written statement of plaintiff (Plaintiff's Exh. No. 2); the August 11, 1981 written statement of John Barr (Plaintiff's Exh. No. 3); and the August 10, 1981 written statement of John Belcher (Plaintiff's Exh. No. 4).

We will later discuss in some detail Mr. Weis' testimony in regard to those statements as they relate to how he actually viewed "the punching incident with Mr. Belcher" at the time of plaintiff's discharge. For present purposes we need only find that nothing was said in any of those statements which could be said to support the notion that plaintiff had "encountered [any other] problems during his short tenure" of employment by the defendant. The three statements to which Mr. Weis made reference related solely to "the punching incident with Mr. Belcher." Defendant did not offer any evidence in regard to what Mr. Randle and Mr. Weis may have discussed before Mr. Weis wrote his March 25, 1982 memorandum to Mr. Randle.

We expressly find that there is no credible evidence in the record that can be said to support that portion of defendant's proposed finding of fact No. 6 which stated that "Plaintiff was terminated from employment with Defendant ... for failure to

adequately meet probationary evaluations." We further find that the plaintiff was fully qualified for employment as a probationary employee of defendant's Water Department in the capacity that he was in fact employed on July 26, 1981 and that he is presently fully qualified to reinstatement in that same position.

### D.

Plaintiff's Exhibit No. 5 was a report form completed on August 11, 1981 by defendant which purported to state the reasons for plaintiff's discharge. That form was executed the day after the incident in the control room by D. Ted Weis as the appropriate "Appointing Authority" and was approved the same day by Renoil Simpkins as the acting "Department Head." Mr. Simpkins approved the check marks which Mr. Weis placed in paragraph H, "Misconduct," and paragraph J, "Failure to get along with others."

Mr. Weis testified that he reviewed the written statement given by plaintiff on August 11, 1981 (Plaintiff's Exh. No. 2), the written statement given by John Barr, the only eye witness of the incident between plaintiff and Harold Belcher (Plaintiff's Exh. No. 3), and the written statement made by John Belcher on August 10, 1981 (Plaintiff's Exh. No. 3), before he completed the form.

Mr. Weis, however, testified on cross-examination that in spite of what might have been contained in the three written statements, he was clearly under the impression at the time he filled out the discharge form that the plaintiff was, in fact, the aggressor in the incident between plaintiff and Belcher. Consistent with his later March 25, 1982 Inter-Department Communication

to Mr. Randle (Plaintiff's Exh. No. 15), Mr. Weis testified on cross-examination that the view he had at the time of plaintiff's discharge of "the severeness of the fighting episode" completely exonerated Mr. Belcher from any blame whatsoever and required plaintiff's immediate and summary discharge.[4]

While there was considerable testimony at trial concerning what actually occurred between plaintiff and Belcher after they got into their argument over plaintiff's use of the telephone, we are satisfied that Mr. Belcher's August 10, 1981 written statement, taken 20 minutes after the incident occurred, and the two written statements given by plaintiff and John Barr on August 11, 1981, the day after the incident occurred, come very close to stating the truth in regard to whether plaintiff or Mr. Belcher made the first physical contact.

Harold Belcher's statement (Plaintiff's Exh. No. 4), dated August 10, 1981, was made "for the record," in regard to the "Incident 8/10/81, Secondary Control Room—Poindexter & Belcher." That statement shows on its face that it was made "at 4:00 p.m., Monday, August 10, 1981." Paragraphs 7, 8 and 9 of the admitted and undisputed facts stated in part II above were obviously based on the following part of Mr. Belcher's August 10, 1981 statement:

> At approximately 3:30 p.m., I was setting the charts at the north wall of the Secondary control room. Poindexter was setting at the desk at the south wall, it looked like he was sleeping. Approximately 3:40 p.m., he got up and walked around, then he used the phone. He said someone wanted to talk to me. (He had gotten the Chem. Building by mistake on the direct line, and thought they were

---

**4.** As noted above, for reasons which have never been clear, defendant proposed and plaintiff admitted that "Plaintiff was a probationary employee, having only worked for Defendant forty-eight (48) days and as such had not yet accrued permanent status under Defendants' Charter, Administrative Code, Personnel Rules or Memorandum of Understanding with Local 500 of the American Federation of State, County and Municipal Workers (Rule X of the Personnel Rules,

Article IX Section 2 of the Memorandum of Understanding.)" (Paragraph 4 of defendant's proposed finding of fact).

The fact that plaintiff was a probationary employee simply meant that he was not entitled to any administrative review of his discharge. Defendant's duty not to discharge for discriminatory reasons, however, extends equally to both its probationary and permanent status employees.

calling in). I answered the phone, but they did not want me. I told Poindexter to not tie up the phone, as we needed it to do our job.

Mr. Belcher then stated that plaintiff "said everyone else used it so he can too;" that "I told him I didn't want to argue about it and asked him to leave the room since he had no business to attend to;" and that "We got to the door and he was not leaving." We find that the trial testimony of both plaintiff and Mr. Belcher was consistent with that sequence of events. We also find that up to that point that, although both men were angry, no physical contact had been made by either plaintiff or Mr. Belcher.

We also find that Mr. Belcher's statement accurately stated that after he observed that plaintiff "was not leaving ... the room," that "I [Belcher] pushed him out of the door and *then* he [the plaintiff] hit me with his fist in the jaw ... John Barr then appeared and broke us up" (emphasis ours). While we are confident that both plaintiff and Mr. Belcher were quite angry before any physical contact was made, we find that the portion of Mr. Belcher's written statement, which he reiterated in his trial testimony, to the effect that plaintiff "called me an SOB and other names" and to the effect that plaintiff "left giving me the finger and calling me more names" is not worthy of credence.

Those particular portions of Mr. Belcher's written statement, and his trial testimony to the same effect, were directly contrary to plaintiff's trial testimony and Mr. Barr's written statement and trial testimony. We reject those portions of Mr. Belcher's written statement and his trial testimony to the same effect and accept that given by plaintiff and Mr. Barr. We are satisfied that if plaintiff had, in fact, used the traditional "fighting words" attributed to him by Mr. Belcher that Mr. Barr, a relatively disinterested witness, would certainly have recalled the use of those words.

Mr. Belcher significantly stated in the last sentence of his August 10, 1981 statement that "I want this man to stay out of the control room *and I want something done about this*" (emphasis ours). The general picture painted in Mr. Belcher's statement was to the effect that he did not push the plaintiff out of the door until after the plaintiff had called him "an SOB and other names." We find that Mr. Belcher obviously believed that his admitted physical action of pushing the plaintiff out of the door would be considered to be fully justified under the circumstances he related in his statement and that plaintiff, upon investigation, would be found to be completely at fault when he hit Mr. Belcher in the jaw after being pushed by Mr. Belcher.

We find from all the facts and circumstances that Mr. Belcher's demand that "I want something done about this" reflected his belief that his statement of the sequence of the events as a White man would undoubtedly be supported by Mr. Barr, another White man, and that his word that he had been called "an SOB and other names" would be accepted over any denial that plaintiff, a Black man, might make in that regard during the course of any investigation that would be made of the incident. Our observation of all the witnesses in this case produced a substantial doubt in our mind as to whether Mr. Belcher would have made his immediate demand that "I want something done about this" if Mr. Barr had not been a White man and if plaintiff had not been Black.

Mr. Barr, of course, was not the most articulate witness that this Court has ever observed on the witness stand. He was, however, a key witness in the case. We find that his trial testimony was consistent with and corroborated the written statement he gave the day following the incident. We believe that he told the truth when he gave his written statement and when he testified at trial. Mr. Barr's statement (Plaintiff's Exh. No. 3) stated that he noticed that plaintiff was sitting at a desk in the control room when he (Mr. Barr) entered that room at approximately 3:30 p.m. Although Mr. Barr stated that "I wasn't paying too much attention," he did

notice that plaintiff "got up from the desk and went over and picked up the telephone." Mr. Barr's statement continued as follows:

Next thing I know, he [Poindexter] was handing the phone to Belcher and telling Belcher somebody was on the phone. Belcher took the phone and talked to whoever was on it. Belcher hung up and told Poindexter not to use the phone any more, that it was strictly for business, and not to be used for personal calls. Poindexter said that other people had been using it, one word led to another, I don't remember exactly who said what.

Although Mr. Barr reiterated later in his written statement, as he later tended to emphasize in his trial testimony, that he could not "remember word for word what was said [as] one word led to another," he did remember, as he stated in his written statement and as he repeated in his trial testimony, that after "Belcher ordered Poindexter out of the control room ... Poindexter started to go out." Mr. Barr was equally positive in both his statement and trial testimony that "as he [Poindexter] started to go out, ... he [Belcher] put his hand on his [Poindexter's] shoulder and at that time Poindexter turned around and hit him [Belcher]."

Of equal, if not of greater factual significance, Mr. Barr testified, consistent with what he stated in his written statement that he did not "recall either of them using any profanity." Mr. Barr concluded his written statement by stating that "after he [Poindexter] hit him [Belcher], they started squaring off at one another, I went over and tried to separate them" and at that point, "they calmed down and Poindexter and I left together."

Plaintiff's written statement, the substance of which plaintiff reaffirmed at trial, was consistent with Mr. Barr's written statement and trial testimony as above outlined. Plaintiff stated in his statement (Plaintiff's Exh. No. 2) that after the argument commenced in regard to plaintiff's use of the telephone, Mr. Belcher told plaintiff "to get out of the operating room

and he went over and opened the door." Plaintiff then stated that as "I was going out the door, he reached and grabbed me [and] that is when the scuffle between him and I occurred." Plaintiff has never denied that he struck Mr. Belcher but has consistently stated, as he testified at trial, that he did not do so until after Mr. Belcher made the first physical contact. We believe plaintiff's testimony in that regard, corroborated as it is by both Mr. Belcher's and Mr. Barr's written statements.

We find that the sequence of events following the argument about the use of the telephone was clearly apparent from a fair reading of the three written statements. The factual circumstances established by those written statements, had they been given fair and impartial consideration, would have supported a decision that an appropriate disciplinary reprimand be imposed in regard to both participants in the incident. We find that defendant's admitted failure to impose any disciplinary action against the White employee and its decision to impose the harsh and ultimate sanction of discharge against the Black employee supports our ultimate factual finding that the defendant intentionally discriminated against the plaintiff.

The EEOC reached the same conclusion. The three written statements, together with the other written exhibits above discussed, were considered by the EEOC. Paragraph 26 of plaintiff's proposed findings of fact, which defendant denied, stated that "The EEOC issued a determination on plaintiff's August 13, 1981 complaint in which it found 'reasonable cause' to believe that plaintiff's discharge following the altercation between plaintiff and H. Belcher (white) was discriminatory because, although the altercation was physically provoked by Belcher, only the plaintiff was disciplined." The EEOC Determination was admitted in evidence as Plaintiff's Exh. No. 7. That Determination stated in its relevant part that:

The evidence shows Charging Party and the Caucasian had a verbal disagreement and the Caucasian physically pushed

Charging Party. The evidence also shows Respondent was aware of this and took no disciplinary action against the Caucasian. However, there is no evidence to substantiate the contention that the Caucasian's duties included physically pushing Charging Party or otherwise exercise any authority over him. Charging Party's physical retaliation foreseeably resulted from physical provocation. It is reasonable to feel some discipline should have been assessed against the White employee. Respondent's failure to do so makes it reasonable to believe such failure resulted because the race of the White employee.

Courts are under duty to give appropriate deference to EEOC determinations in the trial of Title VII cases. *See Bell v. Bolger*, 708 F.2d 1312, 1321 (8th Cir.1983). We find that the determination made by the EEOC in this case supports paragraph 26 of plaintiff's proposed finding of fact in regard to the EEOC's finding. The disputed issue of fact created by defendant's denial of that paragraph of plaintiff's proposed findings of fact is thus resolved in favor of the plaintiff.

It is appropriate to add that we do not in any way consider the EEOC determination to be binding on this Court. That determination, however, was admissible in evidence and has been considered, together with all the other facts and circumstances of the case in our resolution of the disputed issues of fact in this case.

We expressly find from all of the evidence in the case that the plaintiff has carried the ultimate burden of persuading this Court that the defendant's decision to discharge the plaintiff more likely than not was motivated by plaintiff's race. We further find that although the defendant articulated reasons which may be considered to have been legitimate, nondiscriminatory reasons for plaintiff's discharge, we expressly find that plaintiff established by a preponderance of the credible evidence that the defendant's articulated reasons for plaintiff's discharge were, in fact, pretextual and unworthy of credence.

Stated in the framework of *Aikens'* language, we find that the defendant intentionally discriminated against plaintiff when plaintiff was discharged. In short, we believe plaintiff's explanation of the defendant's motivation and reject defendant's explanation as being unworthy of credence.

### IV. Conclusions of Law

The parties were not in substantial disagreement in regard to the applicable law. As we have noted above, both submitted respective proposed conclusions of law that plaintiff established a prima facie case of discriminatory discharge in accordance with the framework of *McDonnell Douglas-Burdine.* We agree that we should so conclude. For purposes of clarity, we incorporate as a part of our conclusions of law our earlier discussion of *Aikens* in part II, B above by this reference.

We add that our ultimate finding of fact that the defendant intentionally discriminated against plaintiff need not be established by direct evidence; rather, we conclude that intentional discrimination may be established, as we find that it was in this case, by indirect and circumstantial evidence. *See Teamsters v. United States*, 431 U.S. 324, 358 fn. 44, 97 S.Ct. 1843, 1866 fn. 44, 52 L.Ed.2d 396 (1977).

The defendant proposed only two conclusions of law, both of which will presently be quoted, in addition to its proposed prima facie conclusion of law. Both cite and rely solely on Judge Sachs' recent opinion in *Johnson v. Bendix Corp.*, 31 FEP Cases 158 (W.D.Mo.1983) and on two additional cases, *Otis v. Inland Container Corp.*, 25 FEP Cases 1280 (N.D.Ill.1981) and *S.J. Groves & Sons v. Inter. Bro. of Teamsters*, 581 F.2d 1241 (7th Cir.1978), both of which were cited and discussed in *Johnson.*

Those three cases did no more than apply familiar principles of Title VII law to the particular factual circumstances presented in each of those cases. For example, Judge Sachs in *Johnson* first concluded that "plaintiff did make out a prima facie of discrimination from stipulations in the

parties' pretrial filings." *Johnson* later noted that "Although plaintiff had established a prima facie Title VII case, defendant has articulated a legitimate reason for plaintiff's discharge, namely, that he was the physical aggressor and escalated the confrontation into a physical conflict."

*Johnson* concluded, however, that under the particular factual circumstances of that case, plaintiff "is not entitled to prevail in this Title VII and § 1981 action" for the reason that "plaintiff has failed to demonstrate that his employer's stated reason for his termination was merely a pretext for discrimination," in that "the evidence at trial demonstrates clearly that plaintiff's dissimilar conduct and work history justify the dissimilar treatment he received."

No useful purpose would be served by a detailed recitation of the factual circumstances of either *Johnson* or the two other cases relied upon by defendant to support its proposed conclusions of law. We have carefully considered those cases and conclude that all three cases are inapposite on their respective facts.

The difficulty with both of defendant's proposed conclusions of law is more fundamental. Paragraph 2 of defendant's proposed conclusions of law stated that the "Defendant has articulated a nondiscriminatory reason for Plaintiff's discharge, i.e., that [plaintiff] escalated a minimal confrontation and touching into a physical conflict." Paragraph 3 of defendant's proposed conclusions of law stated that "A discharge for fighting may be justified regardless of the existence of the provocation ... where the response is out of proportion to the provocation."

Plaintiff Exh. No. 5, the official report of plaintiff's discharge, does not state that plaintiff was discharged because he "escalated a minimal confrontation and touching into a physical conflict," as defendant assumed in paragraph 2 of defendant's proposed conclusions of law. Nor does that report state that the plaintiff had been discharged "for fighting," as defendant assumed in paragraph 3 of defendant's proposed conclusion of law. Rather, the report of discharge shows that Mr. Weis only checked the items of "misconduct" and "failure to get along with others."

We accordingly conclude that the reason articulated by defendant for discharging plaintiff, "misconduct" and "failure to get along with others," has been shown by a preponderance of the credible evidence to be pretextual and thus a cover-up of defendant's discriminatory discharge. In short, we conclude that plaintiff has carried the ultimate burden of proving that the defendant intentionally discriminated against the plaintiff when it discharged him for the pretextual reasons stated on its official discharge form.

We conclude that the principles on the order and allocation of proof as stated in *McDonnell Douglas* and its progeny, including *Aikens* as one of the progeny, are applicable to an action brought under 42 U.S.C. § 1981. *Person v. J.S. Alberici Const. Co., Inc.*, 640 F.2d 916, 918 (8th Cir.1981) and cases there cited.

Under all the facts and circumstances, we find and conclude that plaintiff, under Title VII, is entitled to reinstatement as a probationary employee of defendant and is also entitled to recover lost wages in an amount equal to the difference between his income since August 12, 1981, and the date of his reinstatement with defendant, plus interest. Jurisdiction of the case will be retained during plaintiff's probationary period. *Locke v. Kansas City Power and Light Co.*, 660 F.2d 359 (8th Cir.1981).

We further find and conclude that plaintiff is also entitled to appropriate compensatory damages under his established § 1981 claim. *Williams v. Trans World Airlines, Inc.*, 660 F.2d 1267 (8th Cir.1981). While we recognize that a successful § 1981 plaintiff "is entitled to both equitable and legal relief, including compensatory and, under certain circumstances, punitive damages," *Johnson v. Railway Express Agency*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), we find and conclude that it is not appropriate to award plaintiff punitive damages under the established facts and circumstances of this case.

We finally conclude that plaintiff is further entitled to an award of costs and attorney's fees, pursuant to 42 U.S.C. § 2000e–5(k) and the Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988.

## V.

It is not appropriate that we enter an order at this time which would direct the Clerk to enter final judgment for the plaintiff for two reasons. First, the parties should be able to agree on the particular dollar amounts that plaintiff is entitled to recover as back pay because the ascertainment of the appropriate dollar figure is largely a matter of mathematical calculation.

Secondly, the Court of Appeals expressed its real concern over fragmentation of appeals in *Obin v. Dist. No. 9 of Intern. Ass'n, etc.*, 651 F.2d 574, 583 (8th Cir.1981) in cases in which attorney's fees are to be awarded. *Obin* stated that "this court deems it essential that all district courts follow a consistent practice of promptly hearing and deciding attorney's fees claims in civil rights and other cases so that any appeal by an aggrieved party from the allowance or disallowance of fees can be considered by this court together with any appeal taken from a final judgment on the merits." *Obin* appropriately added the observation that "the problem of possible piecemeal appeals need not arise where the trial court delays entry of judgment on the merits pending determination of attorney's fee claims and thereafter enters a single final judgment determining all issues."

Counsel will therefore be afforded an opportunity to agree on the amount of attorney's fees to be awarded. The Court is confident that experienced counsel in this case are fully familiar with standards established by the Eighth Circuit and applied by this Court in regard to attorney's fees awards. The guidelines for attorney's fees awards set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974) have long been expressly approved by the Eighth Circuit in many cases. *See*, for example, *Zoll v. Eastern Allamakee Community Sch. Dist.*, 588 F.2d 246, 252 (8th Cir.1978) and cases there cited. *Oldham v. Ehrlich*, 617 F.2d 163, 168–69 (8th Cir.1980) makes clear that the same guidelines are applicable to fee awards to legal aid attorneys.

The Court is also confident that in their efforts to reach agreement in this regard, counsel for both sides will keep in mind the recent admonition of the Supreme Court in *Hensley v. Eckerhart*, —— U.S. ——, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), that "a request for attorney's fees should not result in a second major litigation." "Ideally, of course," the Court added, "litigants will settle the amount of a fee." We trust that counsel will be able to attain that ideal in this case in regard to the amount of attorney's fees to be awarded.

Counsel may also be able to agree on the amount of compensatory damages that plaintiff is entitled under § 1981. We recognize that this is a more difficult task than reaching agreement on the amount of back pay and the amount of the attorney's fees award. In regard to their effort to reach an agreement on the amount of compensatory damages, counsels' attention is directed to the teaching of *Williams v. Trans World Airlines, Inc., supra*, at 1274. That case concluded that it was clearly erroneous for a district court to simply double the Title VII damages award as a means of calculating plaintiff's § 1981 damages. *Williams* also made clear that damages under Title VII and § 1981 "are only recoverable once for a transaction involving two violations of law."

The Court will, of course, retain jurisdiction for the purpose of conducting further appropriate proceedings should the parties be unable to reach agreement on all items discussed.

## VI.

For the reasons stated, it is

ORDERED (1) that plaintiff is entitled to the equitable and legal relief stated above in regard to both his Title VII and § 1981 claims. Plaintiff is also entitled to an

award of attorney's fees as above stated. It is further

ORDERED (2) that the entry of an order directing that the Clerk enter final judgment on a separate document pursuant to Rule 58 of the Federal Rules of Civil Procedure is hereby deferred until counsel for the parties are afforded an appropriate opportunity to reach an agreement on a form of final judgment which will include, but not be limited to, counsel's agreement in regard to: (a) plaintiff's reinstatement as a probationary employee under Title VII; (b) the amount of back pay and interest thereon to be awarded under Title VII; (c) the amount of attorney's fees to be awarded; and (d) the amount of compensatory damages to be awarded under § 1981. It is further

ORDERED (3) that counsel for the parties shall promptly arrange for an across-the-table conference for the purpose of reaching an agreement on the form of a final judgment which shall reflect their agreement on the items stated in Order (2) above so that final judgment may be entered on or before November 15, 1983. It is further

ORDERED (4) that the conference of counsel directed in Order (3) above shall be convened not later than November 7, 1983 in order that the Court may be advised on or before November 8, 1983 in regard to all items that counsel believe they will be able to reach agreement.

If counsel report to the Court on November 8, 1983 that they will not be able to reach a full agreement on a complete form of final judgment, the Court will promptly convene a conference with counsel for the purpose of determining what further proceedings should be directed under the circumstances.