**Martha D. YOUNG, Plaintiff-Appellant,**

**v.**

**SOUTHWESTERN SAVINGS AND LOAN ASSOCIATION, Defendant-Appellee.**

**No. 74–1306.**

United States Court of Appeals, Fifth Circuit.

March 5, 1975.

Rehearing Denied May 5, 1975.

---

Joseph F. Archer, W. Arthur Combs, Houston, Tex., for plaintiff-appellant.

Charles L. Price, Houston, Tex., for defendant-appellee.

Before THORNBERRY, GOLDBERG and GODBOLD, Circuit Judges.

GOLDBERG, Circuit Judge:

Congress, through Title VII,[1] has provided the courts with a means to preserve religious diversity from forced religious conformity. In this Title VII case brought pursuant to 42 U.S.C. § 2000e–5, plaintiff-appellant Young claims that her former employer, defendant-appellee Southwestern Savings & Loan Association [Southwestern], discharged her in circumstances amounting to religious discrimination. After a trial without a jury, the district court found that although plaintiff's complaint of ill use was not entirely unfounded, she had not been fired but had resigned her position, and so could point to no illegal action by Southwestern. After a careful consideration of the record and of the statutory, regulatory, and case law in this area of tender sensibilities, we find that Mrs. Young was in fact the victim of religious discrimination. We reverse.

At the time Mrs. Young accepted employment as a teller at Southwestern's Bellaire, Texas, branch in February, 1971, she knew that all of Southwestern's employees were required to attend a monthly staff meeting at the down-

---

1. 42 U.S.C. § 2000e et seq.

town Houston office.[2] Employees are paid for attending these 45-minute meetings, which are concerned with various business matters, such as organization policy, current economic conditions and future plans. Upon arriving at her first such meeting in February, 1971, however, Mrs. Young discovered that the convocation began with a short religious talk and a prayer, both delivered by a local Baptist minister.

This theological appetizer, nondenominational though it might be, was somewhat uncongenial to plaintiff, who is an atheist.[3] She made no complaint at the time, however, and attended the March, 1971, staff meeting, which was also inaugurated by a short devotional led by a Protestant cleric. At that point, Mrs. Young decided that although she did not object to the business portion of the meetings, she felt that her freedom of conscience was being violated by forced attendance at "prayer meetings," and, once again registering no protest with anyone, plaintiff resolved to attend no more meetings.

Mrs. Young was, by all accounts, an excellent employee and enjoyed a good relationship with peers and superiors alike. For several months, her absence at the staff meetings went undetected. Then, at the September 15, 1971 meeting, someone noticed that neither plaintiff nor the other Bellaire teller was at the meeting, and this fact was reported to Michael O. Bostain, the Bellaire branch manager. When Bostain returned later that morning to Bellaire, he asked plaintiff and her co-worker to explain their absence. The other lady confessed that she had forgotten about the meeting and the matter ended as to her. Mrs. Young was forced to reveal her objections to the religious content of the meetings, however, and she informed Bostain that she could not attend the affairs. Bostain, somewhat surprised at this revelation, reminded Mrs. Young that the primary purpose of the meetings was the discussion of business matters. He added that plaintiff had an obligation to attend the entire meeting, and advised her that if she objected to the devotionals, she could simply "close [her] ears" during that time. Mrs. Young restated her complaint and her resolution not to attend the meetings, whereupon Bostain concluded the conversation by saying that the meetings were mandatory, and that he would leave the decision to her.

At closing time on September 15, Mrs. Young advised Bostain that she was checking out her cash drawer, turning in her keys and leaving Southwestern. Bostain asked the reason for this action, and plaintiff answered that she could not attend the "prayer meetings." Bostain then asked Mrs. Young for a letter of resignation, but she refused, saying, "No, I am being fired." Bostain assured her that she was not being fired, but plaintiff left without further discussion.[4]

---

2. The employees at one far-flung financial outpost in Houston were exempted from this requirement.

3. Although Mrs. Young was a member of the Unitarian Church at all times relevant to this lawsuit, she has since left that Church; the record demonstrates that her religious beliefs had not changed from February, 1971, to the time of trial in June, 1973. There is no question of the sincerity of Mrs. Young's religious beliefs.

4. Bostain's account of Mrs. Young's termination is contained in a memorandum to Southwestern's vice-president in charge of personnel, dated September 22, 1971:

Upon returning to the Bellaire office from last Wednesday's staff meeting, I talked with my staff about their attendance at the meetings each third Wednesday of the month. I explained to them it was mandatory to attend this one meeting each month, and Mrs. Jo Young informed me that she would not attend the meetings. I told her she was informed of these meetings when she was hired, and it was a part of her job to attend. I asked her to let me know if she planned to fulfill her duties in this capacity and left the decision to her. Later that day she came to me and told me she was checking out her drawer. Knowing she had had some transportation problems in the past, I asked if this was why she was unhappy. She informed me this was not the problem, and stated that she would not attend a Prayer Meeting on Wednesday mornings. I took this as her resignation.

Later that same day, plaintiff wrote to Southwestern, explaining her position as outlined above and requesting two weeks' termination pay, which request was granted. Mrs. Young then contacted the Equal Employment Opportunity Commission about the possibility of filing charges against Southwestern, but nothing came of this effort. Plaintiff initiated this lawsuit on July 13, 1972 demanding reinstatement, back pay and attorney's fees and asking the district court to enjoin Southwestern from "presenting religious activities at their monthly meetings and in all other aspects of their relationship with their employees."

The district court found that the facts related above compelled the conclusion that Mrs. Young had voluntarily resigned her position, so that she had failed to demonstrate any act of discrimination against her arising out of the monthly staff meetings. For this reason, the court entered judgment for Southwestern. Although we cannot say that the district court's findings of fact are clearly erroneous, or that the court erred in any particular in its statement of the law pertaining to religious discrimination in general, we believe that the district court incorrectly applied the law to the peculiar facts of this difficult case. We find that Mrs. Young was constructively discharged in circumstances which amounted to religious discrimination against her by Southwestern.

## I

■ Title VII forbids an employer: "to . . . discharge any individual . . . because of such individual's . . . religion . . . ." 42 U.S.C. § 2000e–2(a)(1).[5] In order to prevail in this lawsuit, Mrs. Young had to prove that she was discharged on account of her religious beliefs. Once she performed that task, she would have established a prima facie case of unlawful discrimination which Southwestern could then rebut by evidence that it could not reasonably accommodate her beliefs without undue hardship on the conduct of its business. Riley v. Bendix Corp., 5 Cir. 1972, 464 F.2d 1113; Reid v. Memphis Publishing Co., 6 Cir. 1972, 468 F.2d 346; Weitkenaut v. Goodyear Tire & Rubber Co., D.Vt.1974, 381 F.Supp. 1284; Shaffield v. Northrop Worldwide Aircraft Services, Inc., M.D.Ala.1974, 373 F.Supp. 937; Claybaugh v. Pacific Northwest Bell Tel. Co., D.Ore.1973, 355 F.Supp. 1.[6]

■ Although there is no question that this dispute is solely the product of Mrs. Young's objections to the religious content of Southwestern's staff meetings, the trial court found that "no atmosphere of religious intimidation existed at Southwestern which could cause Mrs. Young's resignation to be interpreted as constructive discharge," and that plaintiff had voluntarily resigned. It is true that there is no evidence of proselytization by Southwestern here and that the course of events leading to Mrs. Young's departure was rather too swift and spontaneous to admit any inference of an "atmosphere of religious intimidation." However that may be, we believe that the district court required too high a standard for a constructive

5. The district court correctly found that Southwestern was an "employer" within the meaning of the statute. 42 U.S.C. § 2000e(b)

6. At the time of plaintiff's termination, a regulation of the Equal Employment Opportunity Commission required employers "to make reasonable accommodations to the religious needs of employees . . . where such accommodations can be made without undue hardship on the conduct of the employer's business." 29 C.F.R. § 1605.1. In Riley Bendix, *supra*, we found that this regulation was valid and binding upon employers positioned as Southwestern is here. In March, 1972, Congress amended the Civil Rights Act of 1964 specifically to require accommodation of the sort previously required by the EEOC: "The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless the employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." Act of March 24, 1972, Pub.L. No. 92–261, § 701(j), 86 Stat. 103. 42 U.S.C. § 2000e(j).

discharge. The general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee. *See* N. L. R. B. v. Brennan's Inc., 5 Cir. 1966, 366 F.2d 560; J. P. Stevens & Co., Inc. v. N. L. R. B., 4 Cir. 1972, 461 F.2d 490; N. L. R. B. v. Cavalier Olds., Inc., 6 Cir., 1970, 421 F.2d 1234; Retail Store Employees Local 880, R. C. I. A. v. N. L. R. B., 1969, 136 U.S.App. D.C. 27, 419 F.2d 1329; N. L. R. B. v. J. W. Mays, Inc., 2 Cir. 1966, 356 F.2d 693; *see also* EEOC Decision No. 72–1114, Feb. 18, 1972, CCH Employment Practices Guide ¶ 6347.

 In this case, Mrs. Young enjoyed her work and Southwestern valued her services. The only possible reason for her resignation on September 15, 1971, was her resolution not to attend religious services which were repugnant to her conscience, coupled with the certain knowledge from Bostain, her supervisor, that attendance at the staff meetings—in their entirety—was mandatory and the reasonable inference that if she would not perform this condition of her employment, she would be discharged. In these circumstances, when she could hope no longer that her absence at the meetings would not be noticed, she could reasonably infer that in one week, one month or two months, she would be discharged because of the conflict between her religious beliefs and company policy. Surely it would be too nice a distinction to say that Mrs. Young should have borne the considerable emotional discomfort of waiting to be fired instead of immediately terminating her association with Southwestern. This is precisely the situation in which the doctrine of constructive discharge applies, a case in which an employee involuntarily resigns in order to escape intolerable and illegal employment requirements.[7]

## II

 Since we have concluded that Mrs. Young made out a prima facie case of religious discrimination under the Civil Rights Act of 1964, we must now determine whether Southwestern presented evidence sufficient to rebut plaintiff's showing of unlawful employment practices. At the time of plaintiff's termination, Southwestern had an obligation to accommodate her religious beliefs and observances unless it could show that "an undue hardship" to its business rendered the accommodation of Mrs. Young's objections unreasonable. 29 C.F.R. § 1605.1; *see* fn. 5, *supra*. Although it is certainly true that an employer sometimes cannot reasonably accommodate the religious needs and observances of all of its employees, *see* Johnson v. United States Postal Service, 5 Cir. 1974, 497 F.2d 128; Hardison v. Trans World Airlines, W.D.Mo.1974, 375 F.Supp. 877, Southwestern makes no such contention here. Instead, Southwestern argues that the manner of Mrs. Young's leaving was so precipitous as to give Southwestern no opportunity to accommodate her beliefs. In support of this position, Southwestern points to a company policy, in force at the time of Mrs. Young's termination but known only to a few high-ranking officers, and admittedly unknown either to Bostain or to Mrs. Young, that employees who objected to the devotionals would be permitted to miss that portion of the staff meetings. Southwestern urges that if only plaintiff had contacted a high-rank-

---

**7.** Southwestern argues that Mrs. Young could not have been discharged because Bostain had no authority to fire any of the employees at the Bellaire branch. While it is certain that Southwestern is correct with respect to the extent of Bostain's actual authority, it is also certain that Mrs. Young had no reason to know of this limitation, and in fact had every reason to assume the contrary, in view of Bostain's firm language of September 15, and of plaintiff's knowledge that her original application for employment had been submitted to Bostain for his approval. Under these circumstances, Southestern cannot disclaim responsibility for Bostain's apparently authorized actions.

ing officer before leaving, the entire matter would have been quickly resolved in a mutually agreeable fashion.

We do not see how Mrs. Young's obligations were in any way altered by the existence of this secret policy. On the date of her departure, plaintiff knew only that attendance at the staff meetings was mandatory. Her supervisor had just assured her, in language that admitted no possibility of accommodation (for as far as Bostain knew, no accommodation was possible), that Southwestern employees had a duty to attend the staff meetings in their entirety. Bostain did not propose a ceasefire or a standstill agreement; he demanded unconditional surrender to the company policy of compulsory attendance at religious services. We can only conclude that Mrs. Young acted reasonably and in a manner which preserved the full measure of her statutory rights.[8]

In her complaint, Mrs. Young requested reinstatement in her former job, back pay, attorney's fees and an injunction against Southwestern forbidding it to include the religious exercises in its monthly staff meetings. On remand, the district court must determine if plaintiff still desires to return to Southwestern and if so, whether an injunction such as she asks would be proper. That court must also determine the propriety and the amount of awards of back pay and attorney's fees to Mrs. Young.

Title VII was designed to restrain discrimination in employment because of religion. The subtle and unrealistic distinction drawn by Southwestern here between resignation and discharge does not deter us from enforcing the statutory mandate. Accommodation as a defense must be unsubtle, direct, undelayed and communicated without equivocation. The statutory defense of accommodation is not met by some *post hoc* hypothesis.

Reversed and remanded.

THORNBERRY, Circuit Judge (dissenting):

I would not hesitate for a moment to join my brothers in finding an employer liable for imposing or attempting to impose "forced religious conformity." This is not such a case. Title VII forbids, inter alia, employment discrimination based on religion. In this context discrimination implies that some employment-related penalty or disadvantage has been imposed on an employee or a job applicant. Because Southwestern claimed, and the district judge found, that appellant was not fired, to prove discrimination here Mrs. Young needed to show that her employer required or tolerated practices so inconsistent with her religious beliefs that she could not continue working and remain true to those beliefs. That is, she had to show that she was "constructively" discharged.[1]

As I understand it, the majority bases its constructive discharge finding on (1) the company's admitted practice of holding monthly business meetings at which the first several minutes are devoted to

---

**8.** We do not hold that Southwestern had an absolute duty to accommodate Mrs. Young's beliefs on the day the dispute arose. On the contrary, if Bostain had not given plaintiff an ultimatum, it is reasonable to assume that the parties would have had one month (the time until the next staff meeting) to work out a satisfactory arrangement; we expect that such action would satisfy the demands of the statute. In the particular circumstances of this case, however, where in the face of Mrs. Young's repeated assertions that she could not in good conscience attend the staff meetings because of their religious content, Bostain presented her with an unqualified choice of compliance or discharge, Southwestern's opportunity to attempt an accommodation at its leisure was forfeited and its duty neglected at the time of Mrs. Young's departure on the afternoon of September 15.

**1.** This case is distinguishable from the normal run of constructive discharge cases because it is a company policy rather than a company practice that appellant claims required her to voluntarily resign. Mrs. Young apparently does not contend that the mere holding of the devotional offended her sensibilities to the extent that she could not continue to work for Southwestern. Rather, it is the company's ostensible mandatory attendance policy that she found incompatible with further employment.

a religious "sermonette", and (2) a single statement by Mrs. Young's immediate supervisor Mr. Bostain that company policy required attendance at the devotional portion of the meetings. In my view this holding expands the constructive discharge doctrine beyond its proper scope in proceedings of this kind. I assume for present purposes that if mandatory attendance at the devotional was in fact settled company policy, Mrs. Young would have been entitled to claim a constructive discharge. During the trial of this case, however, Southwestern's vice president and personnel director stated without contradiction that the company did not require attendance at the devotional portion of the company meeting. He further testified that no penalty attached for failure to attend and that no person had ever been denied any employment benefit because of his or her refusal to be present during the sermonette. Unfortunately, he also related that only the higher ranking officers of the company knew of this policy and that the company had failed to publicize it throughout the organization. This accounts for Bostain's statement to Mrs. Young that attendance at the devotional was mandatory.

For several reasons I think that the better course is to deny the applicability of the constructive discharge doctrine when, as here, the employee can prove only mistaken (although understandable) reliance on an erroneous statement of company policy by a less than authoritative company source. Employment discrimination based on religion is a serious charge, and I believe that basic fairness alone demands that a constructive discharge resulting from this alleged discrimination should rest on a foundation more secure than a breakdown in bureaucratic communication. In addition, allowing an employee to claim constructive discharge only after requesting an authoritative ruling from the company

management would encourage private settlement of employment disputes. Such private settlements are not just desirable from the standpoint of judicial caseloads, *cf.* Penn v. Schlesinger, 5 Cir. 1973, 490 F.2d 700, 713 n. 5 (Godbold, J., dissenting), *dissent adopted* 5 Cir. 1974, 497 F.2d 970 (en banc), but they also seem in harmony with Congress's intent in enacting Title VII—for example, before the E.E.O.C. may take formal enforcement action it must investigate and attempt to settle the dispute by "informal methods of conference, conciliation, and persuasion." 42 U.S.C. § 2000e–5(b) (1974). Moreover, requiring an inquiry concerning company policy as a condition of claiming constructive discharge would serve the highly desirable purpose of either putting the employer on notice of the need to accommodate its employee's religious beliefs or at least of establishing the company's determination to persist in the challenged practice.

This case typifies the anomalous results produced by the contrary rule. At the time appellant left Southwestern there remained approximately one month before the next business meeting. Had Mrs. Young used this time to inquire whether her branch manager had correctly stated company policy, the record gives no reason to doubt that she would have learned that attendance was not required, and this problem would never have reached the courts. Although the company is by no means blameless in the matter, appellant's precipitous departure also made accommodation impossible. Admittedly, Mrs. Young had no particular reason to suspect that Bostain did not know company policy. I would simply hold that in cases like this one any "emotional discomfort . . . [from] waiting to be fired" is insufficient grounds to overweigh the substantial benefits of requiring as a precondition to constructive discharge the painless process of confirming the existence of the offensive company rule.[2]

2. In EEOC Decision No. 72–1114, Feb. 18, 1972, 4 FEP Cases 842, the *Commission* wrote

Clearly, an employer is responsible for the actions of its supervisors. Charging Parties had no obligation to inform higher level

For the reasons stated, I would affirm the district court's finding that Mrs. Young failed to prove a constructive discharge.

management personnel of their supervisor's conduct in order for Respondent to be bound by the requirements of Title VII. Although vicarious liability and other principal-agent rules have their proper place in our legal system, as indicated I see little to gain and much to lose by applying them mechanically in the context of Title VII.