No. 89-207

IN THE SUPREME COURT OF THE STATE OF MONTANA

1991

THOMAS P. DOOHAN,
          Plaintiff and Respondent,

-v-

BIGFORK SCHOOL DISTRICT NO. 38, BIGFORK, MT.,
DR. ROBERT W. BOWMAN, ROBERT CHRYSLER, ALBERT
COCHRANE, ROBERT BOESE, LLOYD MAGNALL, JOSEPH
POTOCZNY, RONALD MARTIN, EDWIN ANDERSON, and
CHARLES MASON, Trustees thereof, the following
Bigfork School District No. 38 Board Members
in their individual capacity; ROBERT CHRYSLER
and ALBERT COCHRANE,
          Defendants and Appellants.



FILED

FEB - 6 1991,

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Eleventh Judicial District,
                In and for the County of Flathead,
                The Honorable Gordon R. Bennett, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

            Stephen C. Berg; Warden, Christensen, Johnson &
            Berg; Kalispell, Montana

        For Respondent:

            Chris P. Christensen, Kalispell, Montana
            John K. Addy; Matovich, Addy & Keller; Billings,
            Montana

        For Amicus:

            Catherine Swift; Montana School Boards Assn.;
            Helena, Montana

                                    Heard:  November 1, 1989

                                Submitted:  October 18, 1990

                                  Decided:  February 5, 1991

Filed:

                                    Clerk

Justice R. C. McDonough delivered the Opinion of the Court.

This case is an appeal from a judgment against Bigfork School District No. 38 (School District) and Trustees Robert Chrysler and Albert Cochrane individually, following a trial in the Eleventh Judicial District, Flathead County, Montana. The jury fixed damages of $87,583.33 against the School District for unlawfully depriving the respondent, Thomas P. Doohan, of his constitutionally protected right to continued employment as a school district superintendent. The jury found defendant School Board Trustees Robert Chrysler and Albert Cochrane each individually liable for intentional infliction of emotional distress and fixed damages in the amount of $1 against Chrysler and $12,500 against Cochrane. We reverse and remand for new trial.

The parties raise several issues which we restate as follows:

As to School District No. 38:

I. Did the District Court err in giving Instruction No. 12?

II. Did Doohan properly state a claim for deprivation of a property right under 42 U.S.C. § 1983?

III. Does substantial evidence support the jury verdict against the School District?

IV. Is the School District immune from liability for civil damages under 42 U.S.C. § 1983?

As to School Trustees Robert Chrysler and Albert Cochrane:

V. Does substantial evidence support the jury's verdict that Cochrane and Chrysler inflicted emotional distress on Doohan?

VI. Are Cochrane and Chrysler entitled to immunity under §

2

2-9-111, MCA?

Doohan raises an issue on cross-appeal:

VII. Did the filing of the Notice of Appeal divest the District Court of jurisdiction to decide Doohan's application for attorney fees pursuant to 42 U.S.C. § 1983?

Doohan was the Superintendent of School District No. 38 in Bigfork, Montana from July 1, 1983, to June 6, 1985, when he took a medical disability retirement. Chrysler was a trustee of the School Board when Doohan began work and Cochrane was appointed to the Board in May of 1984. Doohan alleged that the School Board collectively and Cochrane and Chrysler individually made his working conditions intolerable. Doohan alleged that, as a result of these intolerable working conditions, he suffered severe mental distress and physical illness which forced him into a medical disability retirement. Further, Doohan alleged that Cochrane and Chrysler engaged in a concerted effort to force him out of his job and that their actions constituted an intentional infliction of emotional distress upon him.

During the eight-day trial, Doohan introduced evidence, both testimonial and documentary, relating to numerous specific instances of conduct by the School Board and Chrysler and Cochrane. These instances began in August of 1983 and occurred frequently, oftentimes each month, until June 6, 1985. Testimony related to the appellants' conduct during open School Board meetings, executive School Board sessions, communication with school personnel, communication with the media, communication with

the public, School Board members' communication with each other privately, and various private communications with Doohan.

Defendants introduced evidence that conflicted substantially with Doohan's evidence regarding the same incidents. More specific facts will be discussed as necessary.

## I and II.

We will discuss the first two issues together. First, the defendant School District argues that Instruction No. 12 provides an inadequate definition of the requirements of due process and essentially directed a verdict on the § 1983 claim in Doohan's favor. Instruction No. 12 provided:

### INSTRUCTION NO. 12

Under the United States Constitution and the federal statute I [the court] previously referred to, the Plaintiff is claiming he has been deprived of property and liberty "without due process of law." To be deprived of one's property and liberty "without due process of law" means to be deprived of such rights without authority of the law. Before you can determine, then, whether or not the Plaintiff was deprived by the Defendants of his property and liberty "without due process of law," you must <u>first</u> determine from a preponderance of the evidence in the case whether the Defendants committed the acts alleged, and, if so, whether the Defendants acted under circumstances within or without the bounds of their lawful authority under state law. If the Defendants acted within the limits of their lawful authority under state law, then the Defendants could not have deprived the Plaintiff of any right "without due process of law."

Under Montana law, the Trustees may terminate the services of a Superintendent of Schools only at the expiration of his term, and only if they give him written notice of the termination prior to February 1 of the last year of his contract. The Trustees also have an implied right to terminate the Superintendent prior to the expiration date in the contract only if they give him a hearing on the reasons for the dismissal and find that there is just cause to dismiss him.

4

In this case, Mr. Doohan, the Plaintiff, has claimed that the Defendant Board of Trustees has constructively discharged him from his position as Superintendent without giving him a hearing, and that their actions have deprived him of his constitutionally protected rights to property and liberty.

If you find that the Defendant Board constructively discharged the Plaintiff without notice and hearing you may find the Plaintiff was deprived of the due process of law. (Emphasis in original.)

This instruction was fashioned by the court from the court's own language, several of the plaintiff's instructions, and the first paragraph of the defendant's Proposed Instruction No. 14, which is identical to the first paragraph of Instruction 12 above. Defendant's proposed instruction No. 14, contained the following language in its second paragraph, which was omitted by the Court:

Due process may be defined as notice and opportunity for hearing appropriate to the nature of the case. It is not a mechanical instrument. It is not a yardstick. It is a process. It is a delicate process of adjustment inescapably involving the exercise of judgment by those entrusted with the unfolding of the process. Among the considerations that must enter into the judgment is the precise nature of the interest that has been adversely affected, the manner in which this was done, the reasons for doing it, the available alternatives to the procedure that was followed, the protection implicit in the office of the functionary whose conduct is challenged and the balance of the hurt complained of and good accomplished.

Defendant's definition of due process is taken directly from the United States Supreme Court decision in Anti-Fascist Committee v. McGrath (1951), 341 U.S. 123, 162-163, 71 S.Ct. 624, 643-644, 95 L.Ed. 817, 849, as cited in Montana Power Co. v. Public Service Commission (1983), 206 Mont. 359, 367-368, 671 P.2d 604, 609. While we agree with the trial judge's assessment of this definition

5

as better suited for judicial opinions than jury instructions, nevertheless it is a better definition of due process than the one given in Instruction No. 12. However, we sympathize with the presiding judge in this case for guidelines are sparse in this evolving field of the law.

Instruction No. 12 briefly defines "without due process of law" as "without authority of the law." This definition is conclusory, its inaccuracy is evident in the many cases that have held that a particular law or statute violates the due process requirement of the 14th Amendment. Rather, as the defendant's proposed instruction notes, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Mathews v. Eldridge (1976), 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18, 32; Fuentes v. Shevin (1972), 407 U.S. 67, 81, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556, 570. Generally, "some kind of a hearing" is ordinarily a constitutional requirement for due process purposes before a public employee who has a property interest in his job may be terminated. Cleveland Board of Education v. Loudermill (1985), 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494, 504. And as noted by Justice Frankfurter in the language used in the defendant's proposed instruction, the notice and hearing required are not inflexible; rather they should be "appropriate to the nature of the case." See Anti-Fascist Com., supra.

Obviously, the very nature of a constructive discharge in many cases precludes the giving of notice and hearing on the subject

employee's discharge. This does not, as we shall discuss later, always lead to the conclusion in every case that a constructive discharge in the context of public employment also gives rise to a claim for deprivation of a constitutional right under 42 U.S.C. § 1983. But here, Instruction No. 12 implies that the foregoing is correct. It instructed that the Trustees could terminate Doohan prior to the expiration of his contract only after a hearing on the reasons for dismissal and a finding of just cause. Furthermore, it instructed that Doohan alleged that the Trustees "constructively discharged him from his position as Superintendent without giving him a hearing." The instruction then provided:

> If you find that the Defendant Board constructively discharged the Plaintiff without notice and hearing you may find the Plaintiff was deprived of the due process of law. (Emphasis added.)

The instruction essentially directed a verdict for Doohan on his § 1983 claim because it incorrectly focused on the idea of constructive discharge "without a hearing", and tells the jury that it may find that Doohan was deprived of due process if they find such. However, there was no issue as to giving notice or hearing in this case--both parties agreed that there had been neither notice or hearing. Nor is lack of notice and hearing unusual in a constructive discharge claim. Nevertheless, once the jury found a constructive discharge, they were directed to find a violation of plaintiff's due process rights.

This is not supported by the law. Under the law of this case, the elements of constructive discharge required facts sufficient to logically lead a prudent person to believe his tenure had been

terminated; generally no notice or hearing is in any way involved in that type of a termination. These elements were contained in the court's Instruction No. 10:

INSTRUCTION NO. 10

Plaintiff has asserted a claim for constructive wrongful discharge against the School Board and against Defendants Chrysler and Cochrane as individuals.

The doctrine of constructive discharge applies where facts are present showing harassment, intimidation, coercion or other aggravating conduct on the employer's part which renders working conditions intolerable.

The fact of discharge does not depend upon the use of formal words of firing. The test is whether sufficient words or actions by the employer would logically lead a prudent person to believe his tenure had been terminated.

Because defendants did not object to this instruction, we will not discuss it at length. However, we do point out that while the wording of the second paragraph reflects the definition of constructive discharge given in Snell v. Montana Dakota Utilities Co. (1982), 198 Mont. 56, 65, 643 P.2d 841, 846, the wording of the third paragraph of this instruction was rejected in Frigon v. Morrison-Maierle, Inc. (1988), 233 Mont. 113, 119, 760 P.2d 57, 61, because it actually applies to cases alleging actual discharge. See Hannifin v. Retail Clerks Int'l Ass'n. (1973), 162 Mont. 170, 178, 511 P.2d 982, 987.

Our decision in Snell pointed out that a determination of constructive discharge depends on the totality of the circumstances, and must be supported by more than an employee's subjective judgment that working conditions are intolerable. Snell, 643 P.2d at 846, citing Nolan v. Cleland (N.D.Cal.1979),

482 F.Supp. 668, 672; aff'd in part, rev'd in part, 686 F.2d 806, 812-813 (9th Cir. 1982). Snell involved a federal law claim of constructive discharge in an employment discrimination case under Title VII of the Civil Rights Act of 1974, 42 U.S.C. § 2000e. Many such Title VII employment discrimination cases are accompanied by due process claims under 42 U.S.C. § 1983. See e.g., Hervey v. City of Little Rock (8th Cir.1986), 787 F.2d 1223, Bailey v. Kirk (10th Cir.1985), 777 F.2d 567, Satterwhite v. Smith (9th Cir. 1984), 744 F.2d 1380, Nolan, supra, (9th Cir.1982), 686 F.2d 806, Bourque v. Powell Manufacturing Co. (5th Cir.1980), 617 F.2d 61, Young v. Southwestern Savings and Loan Association (5th Cir.1975), 509 F.2d 140, 144. In Nolan the Ninth Circuit recognized the standard for constructive discharge in Title VII employment discrimination cases adopted by the Fifth Circuit in Young:

> The general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee.

Nolan, 688 F.2d at 812-813; citing Young, 509 F.2d at 144. The Fifth Circuit later clarified Young and adopted an objective standard, stating that a constructive discharge exists when "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." See Bourque v. Powell Manufacturing Co. 617 F.2d at 65. The Bourque court specifically rejected arguments that an employee has to prove that it was the employer's intent to force

9

the employee to resign in Title VII discrimination cases.

While Title VII employment discrimination cases under 42 U.S.C. § 2000e may involve similar issues and are often accompanied by claims under 42 U.S.C. § 1983, such claims are not analogous to § 1983 claims based solely on deprivation of due process where a constructive discharge is alleged as the basis of the claim. Failure to recognize the distinctions between a straight § 1983 action based on constructive discharge and Title VII constructive discharge has led to confusion among the circuits in adopting an appropriate standard for the straight § 1983 action:

> The elements required to establish a constructive discharge claim under the due process clause are not entirely clear. Some courts have required an individual asserting a constructive discharge claim to establish that the defendant forced a discharge in order to avoid a pretermination hearing, see, e.g., Fowler v. Carrollton Public Library, 799 F.2d 976 (5th Cir.), reh. denied, 803 F.2d 717 (1986); others have required that the plaintiff show that the employer either obtained the plaintiff's resignation through misrepresentations or deceit or forced the resignation by duress or coercion, see Stone v. University of Maryland Medical System, 855 F.2d 167 (4th Cir.1988); and still others appear to adopt the Title VII standard, see, e.g., Greenberg v. Kmetko, 840 F.2d 467, 475 (7th Cir. 1988).

Desper v. Montgomery County (E.D.Pa.1990), 727 F.Supp. 959, 964. Other jurisdictions apparently hold that a § 1983 claim can never be based on an allegation of constructive discharge. See, e.g., Beard v. Baum (Alaska 1990), 796 P.2d 1344, 1350.

We think that the position adopted by the Fifth Circuit in Fowler v. Carrollton Public Library, supra, is the better-reasoned one. There, the court analyzed § 1983 claims based on constructive discharge in light of the general principles governing § 1983

10

claims set forth by the United States Supreme Court in <u>Loudermill</u>

and Daniels v. Williams (1986), 474 U.S. 327, 106 S.Ct. 662, 88

L.Ed.2d 662. We quote at length the Fifth Circuit's reasoning:

> The <u>Loudermill</u> rule does not <u>a fortiori</u> apply to cases of alleged constructive discharge. A pretermination hearing is just not feasible when the gist of the employee's claim is that he was forced to resign by unbearable working conditions. More significantly, the lack of a pretermination hearing does not necessarily create a constitutional procedural due process violation when that deficiency was an unintended or fortuitous consequence of harassment at work. In <u>Daniels v. Williams</u> [citation omitted] the Supreme Court recently held that negligent conduct does not implicate the Due Process Clause of the Fourteenth Amendment. . . . The Court cited with approval Justice Powell's concurrence in <u>Parratt</u>, [Parratt v. Taylor (1981), 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420] urging that the word "deprive" in the Due Process Clause connotes more than a negligent act and that the doors of the federal court house should not be "open . . . where there has been no affirmative abuse of power." <u>Daniels</u> 106 S.Ct. at 664-65, citing <u>Parratt</u>, 101 S.Ct. at 1919-20. Discussing a public employee dismissal case, the Court cautioned, "In the absence of any claim that the public employer <u>was motivated by</u> a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights, we must presume that official action . . . if erroneous, can best be corrected in other ways." <u>Bishop v. Wood</u>, 426 U.S. 341, 350, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684 (1976) (emphasis added.)
>     No issue of intent arises in a <u>Loudermill</u> case, because the employee . . . has been actually terminated without resort to constitutionally required procedures. The employer must have consciously ignored procedural due process. . . . [H]owever, constructive discharge may often result as an unintended consequence from the course of interpersonal relations among employees and supervisors. Indeed, that was very likely the case here, for to the extent that Fowler demonstrated unbearable working conditions in the library, there was nevertheless no evidence that Mjaaland and Fowler's coworkers purposefully sought to force her to resign or purposefully planned to avoid the City's post-termination hearing procedure. <u>Without proof of that critical nexus between the conduct complained of and the constitutional right being asserted</u>, we find no general procedural due process protection against harassment at work.

11

. . .

> From the forgoing discussion, it appears that the district court erroneously submitted actual and constructive discharge as theories of § 1983 recovery in the same jury interrogatory. Constructive discharge in a procedural due process case constitutes a § 1983 claim <u>only if it amounts to forced discharge to avoid affording pretermination procedures</u>. (Emphasis added.)

<u>Fowler</u>, 799 F.2d at 980-981. We adopt the rationale of the Fifth Circuit and hold that a valid procedural due process claim based on constructive discharge requires employer conduct motivated by a desire to avoid subjecting its actions to the scrutiny of a termination related hearing. We also note, as did the <u>Fowler</u> court, that our holding here does not affect the viability of the objective constructive discharge standard in a Title VII employment discrimination claim, under 42 U.S.C. §2000e. In those cases, harassment motivated by the discrimination proscribed in the statute automatically establishes the "critical nexus" between the conduct complained-of and the employee's constitutional right. <u>Fowler</u>, 799 F.2d at 980-981.

Thus, not only was it error in this case for the District Court to give an incomplete instruction on the definition of due process and essentially direct a verdict for the plaintiff, the court also erred in instructing the jury that it could find a deprivation of due process if it merely found a constructive discharge under the traditional objective test. Under the law we adopt here a § 1983 claim based on harassment at work requires additional proof of the employer's subjective intent to deprive the employee of his due process hearing.

In this regard, evidence that the Trustees in this case

12

withdrew their request for Doohan's resignation--allegedly for the purpose of investigating the due process requirements to ensure compliance therewith--would be material to the issue of the Trustees actual intent concerning the alleged on-the-job harassment of Doohan. If the jury finds that the Trustees were sincere in their concerns about termination law, it cannot find that the Trustees deprived Doohan of due process of the law. If, on the other hand a jury finds that the Board is merely attempting to disguise its intentional attempts to deprive Doohan of his job and his right to a hearing on his discharge then Doohan has a cognizable claim under § 1983.

It was imperative that Instruction No. 12 told the jury specifically what Doohan had to prove to satisfy each element of the § 1983 claim. To establish a deprivation of that constitutional right, Doohan first had to prove that the School District constructively discharged him. Additionally, he had to prove that such discharge was intentionally carried out with the purpose of depriving Doohan of his right to notice and a hearing. The Court's instructions failed to require this additional proof. The jury was not correctly instructed concerning the requirements of due process in this case nor was it properly instructed on the type of conduct required for liability in a § 1983 case. The giving of Instruction No. 12 was reversible error.

III.

Because we have determined that the giving of Instruction No. 12 was error, we decline to determine the defendant's third issue

13

regarding sufficiency of the evidence to support the verdict against the School District. Because we are essentially adopting a new standard for § 1983 claims based on constructive discharge, we think it fair that the plaintiff have an opportunity to present proof of his § 1983 claim under the Fowler standard at a new trial. Therefore, we decline to rule on the sufficiency of the evidence based on a record developed under a different standard. "The supreme court may not be bound in advance to a record which was not in existence at the time the decision was rendered. . . . If the prior decision of the supreme court does not expressly pass on the sufficiency of the evidence, the district court is free to consider a motion for directed verdict as if there had been no prior proceedings." O'Brien v. Great Northern Ry. Co. (1966), 148 Mont. 429, 441, 421 P.2d 710, 716. In as much as Doohan's § 1983 claim will be re-tried under the new standard, the defendants will have an opportunity to raise the issue of the sufficiency of the evidence supporting the § 1983 claim at an appropriate time. See, e.g., Zeke's Distributing Co. v. Brown Forman Corp. (1989), 239 Mont. 272, 279-280, 779 P.2d 908, 913.

IV.

Appellants argue that the School District is immune from damages under the U.S. Supreme Court's decision in Harlow v. Fitzgerald (1982), 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396. The Harlow decision held that government officials are immune from civil liability as long as their conduct does not violate clearly established law. In pertinent part, Harlow provides:

14

> If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. . . . If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.

Harlow 102 S.Ct. at 2738. Appellants argue that the law applicable to the School Board's conduct in relation to terminating a superintendent is not clearly established. However § 20-4-401, MCA, plainly delineates how a school board must terminate a superintendent. The District Court correctly presumed the Board to have knowledge of this statute and appellants do not argue otherwise.

According to appellants the termination process required by § 20-4-401, MCA, would be the "clearly established" law only if it had affirmatively discharged Doohan and Doohan had alleged that it had wrongfully discharged him. Constructive discharge, however, is a form of wrongful discharge. Thus, if the School Board constructively discharged Doohan, then it did so in violation of § 20-4-401, MCA, which the Board knew outlined the required termination procedure. Furthermore, if a jury finds that the Board constructively discharged Doohan with the purpose of depriving Doohan of the procedures prescribed in § 20-4-401, MCA, the Board obviously cannot claim immunity based on ignorance of the procedures it was purposefully avoiding. Moreover, a state law defense of sovereign immunity under § 2-9-111, MCA, is not available in a § 1983 suit where a defendant school board is

15

otherwise subject to suit in a state court and where such a defense would not be available had the action been brought in a federal forum. Howlett v. Rose (1990), ___U.S.___, ___, 110 S.Ct. 2430, 2442-2445, 110 L.Ed.2d 332, 352-356. Thus, the immunity afforded by § 2-9-111, MCA, does not apply to causes of action granted by the federal constitution such as the Civil Rights Act, 42 U.S.C. § 1983. We hold that the School District is not entitled to immunity from damages under 42 U.S.C. § 1983.

## V.

The defendants Cochrane and Chrysler contend that the record lacks substantial evidence to support the jury's verdict that they intentionally inflicted emotional distress on Doohan. Instruction No. 19 as given by the District Court covered the elements of the intentional infliction of emotional distress and also the scope of the immunity Cochrane and Chrysler pled as a defense to the alleged infliction. It stated:

### INSTRUCTION NO. 19

Plaintiff has asserted a claim for the intentional infliction of emotional distress upon the Plaintiff by Defendants Chrysler and Cochrane. One who by extreme and outrageous conduct intentionally causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm. In order for you to find these two Defendants intentionally inflicted emotional distress upon the Plaintiff, you must find that their behavior, in their relationship with the Plaintiff, was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. The liability does not extend to mere insults, indignities, threats, annoyances, petty oppression and other trivialities.
Emotional distress is defined as mental suffering,

16

anguish, mental or nervous shock or the like. Severe emotional distress is defined as emotional distress such that no reasonable man could be expected to endure it.

I further instruct you that if you find the conduct of Defendants Chrysler and Cochrane, in their dealings with the Plaintiff, arose from their lawful discharge of official duties associated with the introduction or consideration of legislation or action by the Board of Trustees, acting on behalf of the School District, then you cannot find these Defendants intentionally inflicted emotional distress upon the Plaintiff. Nor can you find liability based upon such Defendants' insistence upon his legal rights in a permissible manner even though he is well aware that such insistence is certain to cause emotional distress.

The defendants did not object to this instruction at trial. They now contend on appeal that the record does not contain substantial credible evidence to support the verdict of the intentional infliction of emotional distress. In addition they contend that under § 2-9-111, MCA, they were immunized from liability.

This Court has not yet dealt with a case which merits recognition of a separate cause of action for the intentional infliction of emotional distress. Frigon v. Morrison-Maierle, Inc. (1988), 233 Mont. 113, 123-124, 760 P.2d 57, 63-64. We have not, however, rejected outright the validity of such a cause of action. Rather, we simply have not addressed a factual situation that may give rise to liability for such a tort under the standard set forth in § 46 of the Restatement (Second) of Torts:

One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm results from it, such bodily harm.

Comment "d" to § 46 explains the nature of the conduct necessary to impose liability:

17

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"
>
> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

Restatement (Second) of Torts §46 (1965), comment d.

Doohan introduced evidence tending to show that Chrysler and Cochrane, over a period of eight months to a year, engaged in a campaign designed to oust him from his position as Superintendent. Doohan alleges that prior to this campaign, the record indicates that he had performed exceptionally well and received good evaluations during his first year as Superintendent, and was coping well with the normal positive stresses that the job entailed. Doohan alleges that Cochrane and Chrysler then began their campaign seeking to undermine his credibility and effectiveness by directing the attention of the School Board, the media and the

community towards certain events characterizing Doohan unfavorably. He alleges that they attempted to manipulate the media and they utilized every opportunity to characterize events so as to cast doubt on Doohan's professional abilities and moral character. Doohan alleges that Chrysler and Cochrane worked with others outside of School Board meetings to circumvent Doohan's authority and to lay something in the nature of an ambush during meetings. Chrysler and Cochrane allegedly continued their campaign in the face of Doohan's deteriorating mental and physical condition of which they were allegedly aware. The evidence Doohan contends constitutes extreme and outrageous conduct by Cochrane and Chrysler includes the following:

ROBERT CHRYSLER

1) Doohan insinuates that Chrysler changed his mind about retiring as a Trustee after Doohan determined that there were not enough funds in the school budget to support a school nurse program---for which Chrysler's wife had already applied---so that he could carry out a campaign against Doohan for not recommending the creation of the position and the hiring of Mrs. Chrysler.

2) Doohan and Chrysler disagreed regarding Chrysler's assertion that it is a Trustee's duty to periodically observe classes although not for the purpose of evaluation. Chrysler attempted to observe a class against Doohan's wishes to which the principal, with Doohan's support, objected and eventually prevented Chrysler from doing.

3) Chrysler issued a memorandum critical of Doohan the

19

morning after a school meeting during which Doohan became angry at a school employee, threw down his pencil in disgust and publicly criticized the employee.

4) Doohan was authorized by the Board to investigate and purchase a computer. Doohan purchased the computer pursuant to the lowest bid with only consulting one Board member for approval, allegedly because it was a time limited offer that required immediate action. At a School Board meeting Chrysler criticized Doohan for purchasing the computer without consulting the Board and for allegedly not investigating the compatibility of the software with the appropriate state agency. Doohan alleges that Chrysler would not accept any answer from him as a valid reason for his sudden purchase and attempted to undermine Doohan by insinuating that Doohan was attempting to conceal his failure to investigate software compatibility from the Board.

5) Doohan alleges that Chrysler coordinated a November 26, 1984 School Board meeting agenda in advance and actively urged the Board to listen to totally inappropriate criticism of a superintendent by an elementary school principal in executive session. Chrysler also allegedly encouraged elementary school principal Chris Hagar to request this executive session to discuss the Board's evaluation of him when such an evaluation would properly be performed by Doohan.

6) Doohan asserts that Chrysler gave him a marginal evaluation after the end of the second evaluation period and refused to disclose to Doohan the basis of a comment insinuating

that Doohan was not "totally open and factual."

7) Chrysler supposedly refused to permit Doohan to observe or participate in the tallying of the results of questionnaires which ultimately concluded that the local mill levy did not pass because the voters were dissatisfied with the school administration.

8) Doohan recommended that the School Board not join the Montana School Board Association. Chrysler sent Doohan's memorandum setting forth the reasoning behind his recommendation to the association requesting an opinion thereon.

9) Doohan contends that Chrysler concocted a story regarding a threatening telephone call Doohan supposedly made to Chrysler after a discussion concerning wages for a new secretary position.

ALBERT COCHRANE

1) Doohan alleges that Cochrane had prior knowledge of and probably participated in the preparation of the November 26th meeting agenda with Chrysler.

2) Doohan alleges that Cochrane also brought out in the Board meeting that he had independently investigated charges brought by Hagar regarding an incident in the teacher's lounge and related to the Board that an individual present in the teacher's lounge verified that Doohan had called Hagar an "S.O.B." Cochrane thereby concluded to the Board that Doohan was lying regarding the incident at a time when Doohan was absent and unable to respond to such a serious charge.

3) Doohan asserts that when he entered the meeting Cochrane

criticized him for failing to communicate effectively with Hagar, shook his finger at Doohan and told him to straighten out his relationship with Hagar "or else." Doohan also criticizes Cochrane because he allegedly urged the Board to inappropriately issue a public memorandum suggesting that Doohan was responsible for the lack of communication between Hagar and himself, when in reality the problem was Hagar's fault.

4) Cochrane stated that there was a "cloud of mystery" surrounding the apparent disappearance of the original of Doohan's contract. The absence of the original was discovered when uncertainty arose as to whether the Board had agreed to give Doohan a one or two year contract. Doohan alleges that this comment was meant to insinuate that Doohan was somehow responsible for the contract's disappearance.

5) Cochrane also gave Doohan a marginal evaluation at the close of the second evaluation period and refused to disclose to Doohan the meaning of the "totally open and factual" comment which Doohan alleges was an accusation that he was a liar.

6) When Doohan announced he would hold a faculty morale session, Cochrane allegedly insisted on attending despite Doohan's explanation that Cochrane's attendance was inappropriate and would be disruptive. After much disagreement on this issue Cochrane eventually did not attend.

7) When Cochrane's son Tim was caught in possession of alcohol at school, Doohan alleges that Cochrane attempted to persuade Doohan to impose a lesser penalty on Tim and then berated

him for not doing so. Doohan insinuates that this escalated the motive underlying Cochrane's campaign to oust Doohan, just as the school nurse position incident increased Chrysler's motive to undermine him.

8) Doohan asserts that Cochrane was instrumental in preparing and conducting a survey of School District residents. He alleges that the questions were designed and the results later manipulated to reflect badly upon Doohan's performance as Superintendent, and to imply that Doohan was the reason for the failure of the voters to pass the school mill levy. Doohan alleges that the survey was not scientifically valid and that Cochrane intentionally disregarded a number of suggestions on survey methodology made by High School Principal Zepp concerning distribution and the wording of questions. Doohan also asserts that Cochrane arranged Doohan's absence as a chaperon for a group of students visiting Washington, D.C. so that he would be away from Bigfork and unable to protest at the time the survey was conducted and the results were published.

In reviewing the evidence, we are required to consider it in a light most favorable to Doohan, the prevailing party. Nelson v. Fairmont Hotsprings Resort, Inc. (1988), 234 Mont. 452, 455, 763 P.2d 1135, 1137. We note that the record discloses substantial conflict in the evidence regarding Chrysler and Cochrane's alleged campaign of harassment. The jury apparently resolved these conflicts in favor of Doohan. Even so, it is a question of law whether a plaintiff has introduced sufficient evidence to support

a prima facie case for intentional infliction of emotional distress. Philip R. Morrow, Inc. v. FBS Ins. Montana-Hoiness Labar, Inc. (1989), 236 Mont. 394, 403, 770 P.2d 859, 864. As unfortunate as the apparent consequences to Doohan's health that allegedly arose from his tenure at Bigfork may be, when the evidence is considered as a whole and in the light most favorable to Doohan, the alleged actions of Chrysler and Cochrane still fail to approach the threshold level of "outrageousness" necessary to establish a prima facie case of intentional infliction of emotional distress. In ruling on the defendants' motions for directed verdict, the trial judge stated that "there was copious evidence that the Plaintiff was under acute emotional distress." Indeed, the record does demonstrate that Doohan suffered mental distress or symptoms commonly related to mental distress. However, the record also indicates that Doohan suffered from medical and psychological problems prior to his employment in Bigfork. Thus whether the symptoms he suffered were entirely a result of the Trustees' conduct is unclear. Moreover, we do not live in an "eggshell society" in which every harm gives rise to a right of action for mental distress. First Bank Billings v. Clark (1989), 236 Mont. 195, 206, 771 P.2d 84, 91. As the commentators to the Restatement note:

> Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable person could be expected to endure it. . . .
> The distress must be reasonable and justified under the circumstances, and there is no liability where the

24

plaintiff has suffered exaggerated and unreasonable emotional distress, unless it results from a <u>peculiarly susceptibility</u> to such distress <u>of which the actor has knowledge</u>. . . . (Emphasis added.)

Restatement (Second) of Torts § 46 (1965), comment j. In this regard, Doohan presented the testimony of a psychologist who concluded that Doohan suffered from a personality disorder that arose from his being a recovering alcoholic. This disorder allegedly caused Doohan to over extend himself in order to gain approval of others and be viewed as an extraordinary individual, and consequently made him particularly sensitive to criticism. However, there is no evidence in the record that the Board knew about Doohan's past struggle with substance abuse or any resulting peculiarity in Doohan's personality that would make him unusually susceptible to their alleged attacks.

As we held in <u>Philip R. Morrow</u>, no facts here demonstrate extreme and outrageous conduct going "beyond <u>all possible bounds</u> of decency, and to be regarded as <u>atrocious</u>, and <u>utterly intolerable in a civilized community</u>." Restatement (Second) of Torts § 46 (1965), comment d; <u>Philip R. Morrow</u>, 770 P.2d at 864, <u>Frigon</u>, 760 P.2d at 64. Nor has Doohan presented facts showing a "substantial invasion of a legally protected interest." Johnson v. Supersave Markets, Inc. (1984), 211 Mont. 465, 473, 686 P.2d 209, 213. While we have yet to decide under what facts we will recognize this tort, we have at least decided some situations where we will not. <u>Philip R. Morrow</u>, 770 P.2d 864. We add the situation here to that list. We conclude that the District Court erred when it denied the defendants' motions for directed verdict on Doohan's

intentional infliction of emotional distress claims.

We also note that there is an inconsistency in the jury's answer to interrogatory 2(a) in the special verdict form regarding trustee Chrysler. There the jury found that Chrysler intentionally inflicted emotional distress upon Doohan and awarded $ 1.00 as damages. One element of a prima facie case for intentional infliction of emotional distress is that the plaintiff actually suffer severe emotional distress. See Prosser and Keeton on Torts § 12, pp. 63-64 (5th Ed. 1984), see also Clark 771 P.2d at 91. Thus, unlike other intentional torts against the person--such as assault, battery, or false imprisonment--intentional infliction of emotional distress requires a showing of actual damages. A finding of $1.00 in actual damages--in essence an award of nominal damages--is inconsistent with the finding that defendant Chrysler inflicted "severe emotional distress" upon Doohan. Such distress by its very nature must manifest itself as actual damage, and certainly if "severe" it would amount to substantially more than $1.00.

## VI.

Finally, Cochrane and Chrysler argue that they are entitled to immunity under § 2-9-111, MCA, and as instructed in Instruction No. 19, quoted earlier. However, we need not determine this issue. Doohan brought two state law claims against the individual defendants Chrysler and Cochrane, one for constructive discharge and one for intentional infliction of emotional distress. The jury found no liability against the individual defendants for constructive discharge and, as we have determined, Doohan failed

26

to state a prima facie case for intentional infliction of emotional distress against Chrysler and Cochrane. Thus, all that remains to be determined at retrial is Doohan's § 1983 claim against the remaining defendant, the School District, under the law we have set forth in this opinion. Under our holding on Issue III, immunity does not apply to the School Board on this claim. <u>Howlet</u>, <u>supra</u>, 110 S.Ct. at 2442-2445.

## VII.

Finally, the issue raised by Doohan on cross appeal---whether the filing of the Notice of Appeal divested the District Court of jurisdiction to decide Doohan's application for attorney fees pursuant to 42 U.S.C. § 1988---is rendered moot by our remand of this case for retrial of Doohan's claim under 42 U.S.C. § 1983.

**REVERSED and REMANDED for further proceedings consistent with this opinion.**

We Concur:

_____
Justice

_____
Chief Justice

_____

_____

_____

_____
Justices

27

Justice Fred J. Weber dissents as follows:

My review of the record in a light most favorable to Mr. Doohan demonstrates that he presented a compelling factual case in support of his claims. In addition, I disagree that the defendants presented valid legal grounds for reversal.

In its ruling reversing the judgment on the constructive discharge claim, the majority adopts and retroactively applies a new standard which has been adopted in the Fifth Circuit of the federal courts. That rule is not universally recognized and it was not argued in the parties' briefs. I do not agree that it is a workable rule. I find it inappropriate to retroactively apply such a new standard.

When the challenged jury instruction, Instruction No. 12, is read as a whole and considered with the other instructions given, it does not misrepresent the law. The instructions as given required that the plaintiff prove the key elements of constructive discharge and provided that the defendants could not be held liable if they acted within limits of their lawful authority. I would not recommend the use of Instruction No. 12 in a constructive discharge case because it contained various comments which were not essential in the absence of an issue as to notice or hearing. However, I would conclude that there was no reversible error in the giving of Instruction No. 12.

I further conclude that the record supports the court's action in submitting the issue of intentional infliction of emotional distress to the jury, because the evidence of the

defendants' acts reached the threshold level of "outrageousness." Mr. Doohan presented evidence of many events demonstrating that the conduct on the part of Mr. Cochrane and Mr. Chrysler was intentional in nature, and sufficient to demonstrate a basis for the jury's verdict in his favor. While the defendants presented conflicting evidence, when we view all of the evidence in the light most favorable to Mr. Doohan, as we are required to do, there is clearly sufficient evidence to support the verdict against both Mr. Cochrane and Mr. Chrysler. Our review is of the cold record which is a poor foundation on which to evaluate testimony here and conclude it was not "outrageous." The record clearly demonstrates that the acts of Mr. Chrysler and Mr. Cochrane caused serious emotional distress for Mr. Doohan.

I would affirm the judgment of the District Court.

_____
Justice


Justices John C. Sheehy and William E. Hunt, Sr., concur in the foregoing dissent.

_____

_____
Justices

29